CASE, INCORPORATED,
Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–
Appellee.

No. 94–5140.

United States Court of Appeals,
Federal Circuit.

June 28, 1996.

Marc Lamer, Kostos & Lamer, P.C., Philadelphia, Pennsylvania, argued, for plaintiff-appellant. Of counsel was Fredric T. Rekstis.

Luis M. Matos, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., argued, for defendant-appellee. With him on the brief, were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Sharon Y. Eubanks, Deputy Director.

Before MAYER, PLAGER and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

This action arises under the Contract Disputes Act of 1978, as amended ("CDA"), 41 U.S.C. §§ 601–13 (1994). Case, Incorporated ("Case"), appeals the July 5, 1994 order of the United States Court of Federal Claims in Docket No. 92–873 C. In its order, the court dismissed Case's complaint on the ground that the case was "moot" because the "issue presented" had been decided in a related suit, *Case, Inc. v. United States,* 25 Cl.Ct. 379 (1992). The government defends the court's decision, but also argues that the court was without jurisdiction because the contracting officer lacked authority under the CDA to issue a final decision on the claim in the complaint. For the reasons set forth below, we hold that the Court of Federal Claims properly exercised jurisdiction. On the merits, we affirm.

## BACKGROUND

### I.

On October 31, 1986, the Defense Personnel Support Center ("DPSC") awarded Case Contract No. DLA100–87–C033. The contract required Case to manufacture 582,480 pairs of men's fire resistant coveralls. The coveralls were to be woven from Nomex yarn and Case was to deliver 24,020 to 24,340 units per month beginning June 13, 1987. Case was unable to meet the delivery schedule specified in the contract, however, due to a disagreement with the DPSC over the quality standards set forth in the contract specifications. As a result, Case temporarily closed its plant on September 30, 1987. Subsequently, on February 1, 1988, Case and the DPSC agreed to a new delivery schedule in a contract modification. Under the new schedule, Case was required to furnish the DPSC with 20,000 coverall units per month. The modification, No. P00010 ("Mod.10"), stated, "Contractor's delinquency/anticipated delinquency is not excusable."[1]

Because Case was a small business, it was allowed to bill the government on a monthly basis for costs incurred in connection with the contract. *See* 48 C.F.R. §§ 32.502–4(b), 52.232–16 (1986). Under this arrangement, the DPSC paid Case 90% of the amount Case

---

1. Modifications of the contract made prior to Mod. 10 pertained to alterations in the coverall pattern contained in the specifications.

billed each month. Case then was to pass this payment on to its supplier, Industrion, Inc. ("Industrion"), which, in turn, was to pay its spinner, Dixie Yarn ("Dixie"). Each month, when finished coveralls were shipped, the government would pay Case the remaining 10 percent due on the monthly payment.

Unfortunately, Case experienced supply problems with Industrion and Dixie. Unknown to Case, Industrion had an outstanding debt to Dixie. Allegedly, Dixie applied the payment it received from Industrion to that debt, and did not supply Industrion with yarn for delivery to Case. Consequently, Case was unable to meet the revised delivery schedule set forth in Mod. 10. Eventually, in October of 1988, Case requested a further revision of the delivery schedule, to 12,800 units per month. However, when the contracting officer asked Case to sign a modification providing for the delivery schedule Case had requested, Case refused to sign until its Industrion/Dixie supply problems were resolved.

Unwilling to accept Case's condition, the contracting officer unilaterally modified the contract on December 21, 1988, in modification No. P00021 ("Mod.21") to impose a new delivery schedule of 12,800 units per month. After Case failed to meet the new delivery schedule, the contracting officer issued a show cause letter on February 3, 1989. After submitting a proposal for contract completion that was unacceptable to the DPSC, Case made no deliveries after April 19, 1989. On July 20, 1989, the contracting officer issued a final decision terminating the contract for default. Shortly thereafter, on August 3, she issued a second final decision in which she demanded from Case the repayment of unliquidated progress payments in the amount of $4,064,212.54, plus interest.[2] The amount sought later was reduced through sales of Case's inventory to $2,806,448.43, plus interest.

## II.

In July of 1990, Case brought an action in the Court of Federal Claims under the CDA.[3] *Case, Inc. v. United States*, 25 Cl.Ct. 379 ("*Case I*"). As reflected in its amended complaint filed on March 3, 1992, Case challenged the contracting officer's final decision terminating the contract for default, as well as her final decision demanding repayment of unliquidated progress payments. Case alleged that it had "experienced problems in performance resulting from defective specifications," and that "[a]s a result of the Specification problems, Case's performance was delayed causing the finisher of the basic fabric to cancel the order and sell off inventory which it had in its possession and for which it had been paid Progress Payments." Case asserted that the default termination was improper and that the government was not entitled to the return of unliquidated progress payments because the Mod. 21 delivery schedule was not reasonable and because, in any event, the DPSC waived the delivery schedule. On April 6, 1992, the government counterclaimed for return of the unliquidated progress payments.

On September 22, 1992, while *Case I* still was pending before the Court of Federal Claims, Case submitted a claim to the contracting officer. In its claim, Case asserted that four problems, for which the DPSC allegedly was responsible, had delayed performance of the contract. Specifically, Case alleged that (1) government inspectors had been overly strict in their inspection of the Velcro stitching margin on the coveralls; (2) there was a defect in the coverall pattern in the specifications in connection with the placement of drill holes; (3) the coverall pattern in the specifications was defective in that it called for a "sleeve finishing too large for the armhole opening"; and (4) the coverall pattern in the specifications further was defective because it called for a "collar finishing too small for the opening at the

---

**2.** The term "unliquidated progress payments" refers to 90 percent monthly payments made by DPSC to Case for which no coveralls were received.

**3.** At the time Case initiated its CDA action, the trial court was known as the "United States

Claims Court." As of October 29, 1992, pursuant to Title IX of the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992), the Claims Court was renamed the "United States Court of Federal Claims." Throughout this opinion, the latter name is used.

back of the garment." Case stated that, "[a]s a result of the foregoing problems [its] performance on the Contract was delayed and disrupted, causing it to incur additional expenses in labor, overhead, and related expenses." Case sought additional compensation in the amount of $1,745,707.55. In addition, it claimed entitlement to $94,966.48 in lost profits, for a total recovery of $1,840,674.03.

After the contracting officer failed to issue a final decision on Case's claim, Case filed suit in the Court of Federal Claims on December 28, 1992. *Case, Inc. v. United States,* Docket No. 92–873 ("*Case II* "). In its suit, Case challenged the contracting officer's deemed denial of its claim for an equitable adjustment and lost profits.[4] Case's challenge to the contracting officer's deemed denial stated that Case had "encountered a number of manufacturing problems related to the Government-provided specifications and patterns, as well as incorrect interpretations thereof by the Government inspectors," and that, as a result, "Case's performance was delayed and disrupted, causing it to incur additional expenses in labor, overhead and related expenses." Case also repeated its claim for lost profits. The trial court suspended proceedings in *Case II* until *Case I* was resolved.

On July 20, 1993, the government filed a motion for summary judgment in *Case I.* In support of its motion, the government argued that Case had failed to meet the delivery schedule as originally established, that Case had continued to fail to deliver according to schedule even after the contract was modified, and that the contracting officer correctly determined that Case was unable to demonstrate the financial ability to continue to perform under the contract. On May 23, 1994, the Court of Federal Claims granted the government's motion for summary judgment in *Case I.* First, the court sustained the termination for default. In so doing, it rejected Case's contention that it suffered detrimental reliance when the government allowed 203 days to elapse between the time Case fell behind on its delivery obligations and the notice of termination of the contract. The court also rejected Case's argument that the government's imposition of the 12,800 units-per-month delivery schedule was unreasonable because Case had failed to locate an alternative source of Nomex yarn.

The court also granted the government summary judgment on its counterclaim. In that regard, the court rejected Case's argument that determination of the final amount it owed the government should await resolution of its claims for an equitable adjustment pending in *Case II:*

> During the early months of the contract, [Case] experienced difficulties in achieving compliance with the contract specifications. Those difficulties, which are now the bases for [Case's] claims for equitable adjustment, were addressed by the parties through bilateral contract modifications issued over the course of several months. Significantly, none of these modifications contain any language either recognizing or preserving a basis for claim in the contractor. To the contrary, the modifications were issued as waivers of contract requirements, with the administrative costs involved being charged to the contractor's account. Plainly, then, these modifications were executed on the premise that the government's waiver of its specification requirements was *not* an acknowledgment of Government liability but rather an accommodation of the contractor....

> In [Mod. 10, Case] clearly acknowledges that it has failed to meet the delivery schedule and that its "delinquency ... is not excusable." This is flatly inconsistent with the position that [Case] is now seeking to maintain, *i.e.,* that it has filed bonafide claims for equitable adjustment.

The court entered judgment for the government for the full amount of its counterclaim, plus interest.[5]

---

4. Under the CDA, a contracting officer is required to issue a decision within sixty days of receipt of a certified claim over $100,000 or notify the contractor of the time within which a decision will be issued. 41 U.S.C. § 605(c)(2). The claim is deemed denied if the contracting officer does not issue a decision in this time period. 41 U.S.C. § 605(c)(5).

5. The court also noted that the fact that Case's claims for an equitable adjustment were not filed until after the default termination was declared

Once *Case I* was dismissed on summary judgment, the government argued that the Court of Federal Claims had no jurisdiction over *Case II* because the filing of *Case I* in court put the subject matter of *Case II* "in litigation" and therefore divested the contracting officer of authority to issue a final decision in *Case II*. After lifting the suspension of proceedings in *Case II*, as noted above, the court dismissed that action as "moot" because the "issue presented"—the claim for an equitable adjustment—had been decided by the court in *Case I*. We read the court's dismissal order as a holding that the claim presented in *Case II* was barred by the doctrine of *res judicata*. In its order, the court did not comment on the government's jurisdictional argument.

Case appealed both *Case I* and *Case II*. We stayed consideration of *Case II* pending our decision in *Case I*. Before this court, in *Case I*, Case argued that the Court of Federal Claims erred in granting summary judgment because genuine issues of material fact existed with respect to (1) whether the government had waived the delivery schedule established by Mod. 21 by unduly delaying in terminating the contract for default, and (2) whether the modified delivery schedule unilaterally imposed by the government in Mod. 21 was reasonable. Case also contended that a genuine issue of material fact existed regarding the fair market value of Case's inventory sold by the government after termination to offset the amount of unliquidated progress payments. On April 3, 1995, we affirmed the grant of summary judgment in *Case I* in a nonprecedential opinion. In that decision, we sustained the trial court's rejection of the claim that the contracting officer had unduly delayed in terminating the contract for default. As for Case's argument regarding the value of its inventory, we found that the Court of Federal Claims had not erred in accepting the auction price of the inventory as the best evidence of fair market value. As for the remaining issue on appeal (the reasonableness of the Mod. 21 delivery schedule), we stated, "We have also considered Case's other arguments and find

"is enough for us to say that they come too late

them without merit." The stay of the appeal of *Case II* was lifted on August 19, 1995.

## DISCUSSION

As it did in the Court of Federal Claims, the government argues that the court was without jurisdiction in *Case II*. For its part, Case contends that the court had jurisdiction but that it erred in dismissing the suit. According to Case, its "claim for an equitable adjustment [in *Case II* ] clearly remains viable, notwithstanding the decision [in *Case I* ] upholding the default." This case thus presents us with two issues: whether the Court of Federal Claims had jurisdiction in *Case II*, and whether, if the court had jurisdiction, it properly determined that the claim presented in *Case II* was barred by *res judicata* based upon the decision in *Case I*.

 We review issues of law *de novo*. *Triax-Pacific v. Stone*, 958 F.2d 351, 353 (Fed.Cir.1992). Jurisdiction is an issue of law. *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1576 (Fed.Cir.1992). Whether, based upon the facts of a case, a claim is barred by *res judicata* also is an issue of law. *See Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 475, 20 USPQ2d 1241, 1246 (Fed.Cir.1991). Here, the pertinent facts are not in dispute. Accordingly, we are presented solely with issues of law. For the reasons that follow, we hold that the trial court properly exercised jurisdiction in *Case II* and that it did not err in dismissing Case's suit.

### I.

 We turn to the jurisdictional issue first. The CDA provides that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). A CDA action may be brought in the Court of Federal Claims or before a board of contract appeals only if (i) the contracting officer has issued a final decision on the contractor's claim, 41 U.S.C. § 605(b), *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1573 (Fed.Cir.1995), or (ii) the contracting officer has failed to issue a final decision on the contractor's claim or to notify

to be taken seriously."

the contractor of the time within which a decision will be issued, and at least 60 days have passed since the date the claim was submitted for a decision, 41 U.S.C. § 605(c)(5); *Do–Well Mach. Shop, Inc. v. U.S.*, 870 F.2d 637, 640 (Fed.Cir.1989). In the latter case, the claim is "deemed denied." *Pathman Const. Co. v. United States*, 817 F.2d 1573, 1575 (Fed.Cir.1987). Closely related to this rule of jurisdiction is the principle that an invalid contracting officer's decision may not serve as the basis for a CDA action. *United States v. Grumman Aerospace Corp.*, 927 F.2d 575, 579 (Fed.Cir.), *cert. denied*, 502 U.S. 919, 112 S.Ct. 330, 116 L.Ed.2d 270 (1991). A contracting officer's final decision is invalid when the contracting officer lacked authority to issue it. *See Ball, Ball & Brosamer, Inc. v. United States*, 878 F.2d 1426, 1428 (Fed.Cir.1989) (where submitted claim was not properly certified, there was no valid claim for the contracting officer to decide).

In this case, the government argues, the contracting officer was without authority to issue a final decision on Case's equitable adjustment claim in *Case II*. Accordingly, the government continues, there could not be a valid deemed denial of the claim. Consequently, the Court of Federal Claims lacked jurisdiction in *Case II*. We agree with the premise of the government's argument—that when a contracting officer lacks authority to issue a final decision on a claim, there can be no valid deemed denial of the claim so as to confer CDA jurisdiction under 41 U.S.C. § 605(c)(5). However, we do not agree that, in this case, the contracting officer was without authority to issue a final decision. Thus, we reject the government's jurisdictional argument.

The basis for the government's contention that the contracting officer was without authority to issue a final decision on Case's equitable adjustment claim is the rule that "[o]nce a claim is in litigation, the Department of Justice gains exclusive authority to act in the pending litigation." *Sharman Co. v. United States*, 2 F.3d 1564, 1571 (Fed.

Cir.1993). The "exclusive authority" given to the Department of Justice "divests the contracting officer of his authority to issue a final decision on the claim." *Id.* at 1571. This rule arises from 28 U.S.C. §§ 516–20 (1994). Most importantly, under 28 U.S.C. § 516, "[e]xcept as otherwise authorized by law, the conduct of litigation in which the United States . . . is a party . . . is reserved to officers of the Department of Justice, under the supervision of the Attorney General." [6] It is the government's position that because the equitable adjustment claim in *Case II* was based upon the same specification defects alleged in the complaint in *Case I*, under 28 U.S.C. §§ 516, only the Department of Justice possessed the authority to act in *Case II*.

In making its jurisdictional argument, the government relies upon our decision in *Sharman*. In that case, the contracting officer issued a final decision terminating the Sharman Company's contract for default. 2 F.3d at 1566. In a letter sent just over a month after the termination for default, the contracting officer sought the return of unliquidated progress payments. *Id.* at 1566–67. The letter was not in the form of a final decision, however. *Id.* Following receipt of the final decision and the demand letter, Sharman filed suit in the Court of Federal Claims. In its complaint, Sharman "sought invalidation of the default termination, conversion of the termination to one of convenience and recovery of all uncompensated costs incurred in the contract's performance." *Id.* at 1567 (quoting *Sharman Co. v. United States*, 24 Cl.Ct. 763, 765 (1991)). Sharman also claimed entitlement, in quantum meruit, to all unliquidated progress payments. *Id.* Later, more than a year after the government had first sought the return of the unliquidated progress payments and more than six months after Sharman had filed its complaint, the contracting officer issued a letter, purporting to be a final decision, seeking return of the unliquidated progress payments. *Id.* In due course, Sharman filed an amended complaint, in which it chal-

---

**6.** Sections 517–20 of title 28 empower the Attorney General to supervise and conduct litigation on behalf of the United States.

lenged both the final decision terminating the contract for default and the subsequent final decision in which the contracting officer asserted a claim against Sharman for the return of the unliquidated progress payments. *Id.* at 1567–68. Shortly thereafter, the government filed a counterclaim for the unliquidated progress payments. After the Court of Federal Claims rendered a decision sustaining the default termination and awarding the government recovery on its counterclaim, Sharman appealed to this court. *Id.* at 1568. In deciding the case, we concluded, among other things, that the contracting officer had lacked authority to issue the final decision in which he demanded the return of unliquidated progress payments. *Id.* at 1570. Consequently, we held, the trial court had been without jurisdiction to adjudicate the government's counterclaim because it had not been the subject of a valid contracting officer's final decision. *Id.* at 1570–71.

The basis for our conclusion in *Sharman* that the contracting officer had been without authority to issue a final decision on the government's claim was the rule—noted above—that once a claim is "in litigation," the Department of Justice gains "exclusive authority" to act in the pending litigation. *Id.* at 1571. We reasoned as follows that the government's claim for the return of the unliquidated progress payments had been "in litigation" at the time the contracting officer purported to issue a final decision with respect to it:

> Sharman's original complaint was filed on February 2, 1990, alleging entitlement to the government's progress payments under a quantum meruit theory as part of its "reimburse[ment] . . . for the value of the work performed." As noted earlier, this asserted entitlement to the progress payments in Sharman's original complaint is the same "claim" as stated by Sharman's amended complaint and the government's counterclaim, because in each case the "claim" alleges entitlement to the same money based on the same partial performance, only under a different label. Therefore, the progress payment "claim" was in litigation between the parties as of

the date that Sharman's original complaint was filed.

*Id.* at 1571.

■■■ The facts of this case distinguish it from *Sharman*. In *Sharman*, both the contractor's initial claim asserting entitlement to progress payments and the government's subsequent counterclaim for the return of progress payments involved precisely "the same money based on the same partial performance, only under a different label." *Id.* at 1571. Thus, we referred to the contractor's claim as being the "mirror image" of the government's claim. *Id.* at 1573. Here, however, the claim in *Case I* was separate and distinct from the claim in *Case II*. In *Case I*, Case challenged the default termination and the government's claim for unliquidated progress payments in the principal amount of $2,806,448.43. As seen above, in the complaint in *Case I*, Case alleged defective specifications. However, the grounds actually asserted by Case in the complaint in support of its challenge to the default termination and to the government's claim for unliquidated progress payments were that the Mod. 21 delivery schedule was unreasonable and that the DPSC had waived the delivery schedule. In *Case II*, on the other hand, Case asserted a claim for additional compensation—over and above the progress payments it had received and to which it claimed entitlement in *Case I*—based upon overly strict government inspection and alleged defective specifications for the coveralls. It also sought to recover lost profits. The claim in Case II was in the total principal amount of $1,840,674.03. In short, the claim in *Case II* was not the "mirror image" of the claim in *Case I*. Moreover, in *Joseph Morton Co. v. United States*, 757 F.2d 1273 (Fed.Cir.1985), we stated that, as used in 41 U.S.C. § 605(b) ("The contracting officer's decision on the claim shall be final and conclusive . . . unless an appeal or suit is timely commenced as authorized by this chapter."), "claim" refers to "each claim under the CDA for money that is one part of a divisible case." 757 F.2d at 1281. That both *Case I* and *Case II* arose out of the same underlying set of facts and involved allegations of defective specifications does not alter the fact that the two cases involved different claims.

Thus, Case's claim for an equitable adjustment and lost profits was not "in litigation" for purposes of 28 U.S.C. § 516 when the contracting officer received the claim. In reaching this conclusion, we are mindful of the admonition in *Hughes Aircraft Co. v. United States*, 209 Ct.Cl. 446, 534 F.2d 889 (1976), that the statutory scheme granting the Department of Justice exclusive and plenary power to supervise and conduct all litigation to which the United States is a party is "broadly inclusive" and, as such, "must be narrowly construed." *Id.*, 534 F.2d at 901. The Court of Federal Claims did not err in asserting jurisdiction in *Case II*.

## II.

■■■■ Turning to the merits, the doctrine of *res judicata* prevents a party from relitigating the same claims that were or could have been raised before. *Epic Metals Corp. v. H.H. Robertson Co.*, 870 F.2d 1574, 1576, 10 USPQ2d 1296, 1298 (Fed.Cir.), *cert. denied*, 493 U.S. 855, 110 S.Ct. 160, 107 L.Ed.2d 117 (1989) (citing *Nevada v. United States*, 463 U.S. 110, 129–30, 103 S.Ct. 2906, 2917–18, 77 L.Ed.2d 509 (1983)). In *Case I*, Case challenged the default termination and the government's demand for the return of unliquidated progress payments; in *Case II*, it appealed the final decision of the contracting officer denying its claim for an equitable adjustment and lost profits. The claim in *Case II* was based on the allegations that the coverall specifications were defective and that there had been overly strict government inspection. The Court of Federal Claims adjudicated the issue of allegedly defective specifications in *Case I*. It did so when it rejected what it characterized as Case's contention "that determination of the final amount due the Government must await resolution of claims for equitable adjustment—claims grounded on allegations of defective specifications." These claims, of course, were pending in *Case II*. The court stated that Case's "difficulties in achieving compliance with the contract specifications ...

were addressed by the parties through bilateral contract modifications issued over the course of several months. Significantly, none of these modifications contain any language either recognizing or preserving a basis for claim in the contractor." The court further stated that "these modifications were executed on the premise that the government's waiver of its specifications was *not* an acknowledgement of Government liability but rather an accommodation of the contractor." Finally, the court referred to Mod. 10, noting that the statement in it that Case's "delinquency ... is not excusable" was "flatly inconsistent" with Case's position that Case was asserting "bona fide claims for equitable adjustment." In its appeal of *Case I*, however, Case did not challenge the holding of the trial court that the doctrine of accord and satisfaction barred Case from contesting, based upon "difficulties in achieving compliance with the contract specifications," the amount due the government on its claim for the return of unliquidated progress payments.[7]

■■■■ In *Case II*, Case claimed entitlement to an equitable adjustment and lost profits on the ground that it "encountered a number of manufacturing problems related to the Government-provided specifications and patterns, as well as incorrect interpretations thereof by the Government inspectors." As just seen, this was the claim of defective specifications that Case asserted in *Case I* when it argued that the Court of Federal Claims should delay determining the amount due the government on its counterclaim for the return of unliquidated progress payments. In *Case I*, the Court of Federal Claims ruled that defective specifications could not be asserted as an excuse in opposition to the government's counterclaim for unliquidated progress payments because Case gave up such an excuse when it agreed in Mod. 10 that its "delinquency" was "not excusable." Case did not appeal that ruling. The language in Mod. 10 that Case's "delin-

---

7. A claim is discharged by the doctrine of accord and satisfaction when "some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his

claim." *Community Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1581 (Fed.Cir.1993) (citing *Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 343 F.2d 951, 955 (1965)).

quency" was "not excusable" is broad; it encompasses an excuse based upon overly strict government inspection and defective specifications. Thus, the ruling in *Case I* that Mod. 10 barred Case from contesting the amount due the government on its counterclaim for unliquidated progress payments necessarily meant that Mod. 10 also barred Case from asserting the claim for an equitable adjustment and lost profits presented in *Case II*. The claim in *Case II* was barred by *res judicata* because it was subject to the same accord and satisfaction (that arising from Mod. 10) that was fully adjudicated in *Case I*. The Court of Federal Claims did not err in dismissing the complaint in *Case II*.

## CONCLUSION

For purposes of 28 U.S.C. §§ 516–20, Case's challenge to the default termination and to the demand for the *return of unliquidated* progress payments in *Case I* was a claim separate and distinct from the claim for an equitable adjustment and for lost profits in *Case II*. Accordingly, the contracting officer was not divested of authority to issue a final decision on the claim in *Case II,* and her deemed denial of the claim was valid. Consequently, the Court of Federal Claims had jurisdiction in *Case II*. As far as the merits are concerned, the claim in *Case II* was barred by the doctrine of *res judicata* because it was subject to the same accord and satisfaction that was fully adjudicated in *Case I*. The decision of the Court of Federal Claims therefore is affirmed.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*