ERVIN AND ASSOCIATES, INC., and
EAA Capital, L.L.C., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 96–504C.

United States Court of Federal Claims.

Sept. 30, 1999.

Wayne G. Travell, Washington, DC, for plaintiffs. Joseph P. Hornyak, Sonnenschein Nath & Rosenthal, Washington, DC, of counsel.

Kathie Ann Whipple, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

*OPINION*

MILLER, Judge.

This case is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction.[1] The issues to be decided are (1) whether plaintiffs' claims are barred by the Contract Disputes Act of 1978, 41 U.S.C.A. §§ 601–613 (West 1987 & Supp. 1999); (2) whether plaintiffs' claims are barred by 28 U.S.C. § 1500 (1994); (3) whether, in the absence of jurisdiction over their initially asserted claims, plaintiffs may add new claims, thereby conferring jurisdiction; (4) whether plaintiffs have asserted valid Fifth Amendment taking claims; (5) whether plaintiffs have asserted valid copyright infringement claims; and (6) whether, as a matter of judicial economy, the court should stay action on any remaining claims. Argument is deemed unnecessary.

## FACTS

The following facts are assumed to be true for purposes of this motion to dismiss.[2] Ervin and Associates, Inc. ("Ervin"), and its subsidiary EAA Capital, L.L.C. ("plaintiffs"), were contractors for the Department of Housing and Urban Development ("HUD"). Pursuant to various agreements with HUD, plaintiffs collected and processed financial data and conducted reviews and physical inspections in connection with certain residential housing projects. The bulk of plaintiffs' business was to provide these services for HUD's extensive residential loan and insurance portfolio. In order to assist it in performing these services, and to maintain a competitive advantage in obtaining future HUD contracts, plaintiffs developed and maintained at their own expense, a comprehensive automated computer information system, called the "Multi–Family Information System."

John Ervin, Ervin's founder, started the business in 1989. Between 1990 and 1994, Ervin was successful in obtaining numerous HUD contracts and in establishing a reputation for competence within the industry. Plaintiffs were estimated to be worth $45,-540,000.00 after only their fifth year of operation. In that same year, 1994, HUD initiated a plan to sell off its entire portfolio of government-owned loans on residential properties valued at almost $12 billion. As HUD executed this program, plaintiffs' personnel observed "instances of bid rigging (i.e., directing the sale of assets toward favored bidders) and procurement irregularities by HUD officials" which caused them pause. Complaint filed Apr. 16, 1998, ¶ 12. Subjecting the program to closer scrutiny, plaintiffs state that a "pattern of irregularities" in administration of the initiative became clearly apparent. *Id.* ¶ at 13. Helen Dunlap, HUD's Deputy Secretary for the Office of Housing Operations, was identified as the most egregious offender.

Initially, plaintiffs brought these observations to the attention of HUD personnel through informal communications. However, finding defendant's responses inadequate, plaintiffs filed a series of formal complaints. Plaintiffs allege that these official protests sparked a retaliatory campaign by HUD officials, acting primarily at the direction of Ms. Dunlap, designed ultimately to destroy plaintiffs' businesses. Seeking to avoid this result, plaintiffs escalated their criticism of HUD by filing Freedom of Information Act requests, GAO protests, and agency-level protests. In response, HUD intensified its retaliatory efforts by failing to renew or terminating outright plaintiffs' existing contracts, procuring services from other suppliers in violation of those exclusive contracts,

---

1. This case was reassigned to the undersigned on August 11, 1999. Supplemental briefing was ordered thereafter.

2. When considering a defendant's motion to dismiss, a court must construe as true the facts alleged in the complaint. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir.1988).

withholding monies properly owed for services performed, fraudulently appropriating data from plaintiffs' automated computer information system, and constructively "blackballing" plaintiffs from consideration on future HUD contracts.[3] Finally, in June 1996, plaintiffs filed suit seeking both declaratory and injunctive relief against HUD and Ms. Dunlap, in her individual capacity, in the United States District Court for the District of Columbia. *See Ervin & Assocs., Inc. v. Dunlap,* No. 96–CV01253 (D.D.C., filed June 5, 1996). By that time plaintiffs' once-stable government contract businesses were ostensibly worthless.

On August 16, 1996, plaintiffs filed this suit. Plaintiffs' second amended complaint, which includes 39 separate counts, recites ten underlying events upon which relief is sought. Each is discussed in turn.

### 1. *Loss of intellectual property*

In counts 1 through 12, plaintiffs assert claims against HUD for loss of intellectual property. On two separate occasions in 1995, HUD demanded that plaintiffs download specific information from their copyrighted Multi–Family Information System for the purpose of, first, populating HUD's Data Warehouse system and, second, conducting HUD's annual Loan Loss Reserve audit. When, on both occasions plaintiffs refused these demands, plaintiffs complain that HUD officials issued threats against them. Under duress, plaintiffs eventually consented to the two downloads. Plaintiffs' consent, however, was acquired only with HUD's assurance and express promise, that the information therein be held confidential. In violation of these conditions, HUD subsequently released the downloaded information to plaintiffs' competitors, allegedly thereby destroying much of the value of plaintiffs' system.

On a variety of other, unspecified dates during Ms. Dunlap's tenure, HUD officials demanded that plaintiffs release various data, reports, and analyses from their Multi–Family Information System. Plaintiffs resisted.

At the direction of Ms. Dunlap, HUD officials issued threats and eventually were able to coerce plaintiffs' agreement. Plaintiffs again conditioned the release of data on assurances that HUD would use it for a strictly limited purpose and that it would maintain confidentiality. In violation of these restrictions, HUD used the released information, together with an unlawfully procured Conditions Notebook, to develop its own derivative version of the Multi–Family Information System. The development of this system obviated the need for future services by plaintiffs.

Based on these factual allegations, plaintiffs seek relief for loss of intellectual property under a breach of contract theory. Plaintiffs alternatively seek relief for these same wrongdoings under copyright law or as a Fifth Amendment taking.

### 2. *Annual Financial Statement contract*

In counts 13 through 17, plaintiffs assert claims against HUD for failure to pay for services performed under, and unlawful termination of, the Annual Financial Statement contract (the "AFS contract"). HUD awarded plaintiffs AFS Contract No. DU100C000018266 on February 14, 1994. The contract required plaintiffs to collect financial statements from holders of HUD-issued mortgages, inventory the statements, and keypunch the data therein into HUD systems. Plaintiffs were further required to conduct a comprehensive review of a specified percentage of these statements. The AFS contract was for one year, with a option on each of the next four years. Plaintiffs successfully fulfilled their obligations under the contract in 1994 and HUD exercised its options on both 1995 and 1996.

Pursuant to the AFS contract, in both 1995 and 1996, plaintiffs sent out mass mailings and made phone calls necessary to collect information for the financial statements. HUD refused to pay the $141,305.00 due for these services. Also in 1996, the second option year of the AFS contract, plaintiffs performed reviews of annual financial state-

---

**3.** The particulars of HUD's retaliatory efforts against plaintiffs can be found in their district court complaint and will not be recounted here.

ments and various other services at the direction of HUD officials. Defendant accepted these services without objection, but thereafter failed to pay plaintiffs the $1,250,-000.00 properly owed under the AFS contract.

HUD terminated the AFS contract for plaintiffs' default, on February 3, 1997, purportedly citing factually indefensible and purely pretextual grounds. On the grounds that plaintiffs' default entitled HUD to set off its reprocurement costs, HUD refused to pay plaintiffs an additional $1,250,000.00 owed for services performed in 1996. Had plaintiffs' performance been evaluated in good faith, the AFS contract would have been renewed for the remaining option years, 1997 and 1998. Plaintiffs estimate $2,820,375.50 in lost profits for these option years.

During late 1996 and early 1997, plaintiffs submitted various certified claims to HUD's contracting officer to obtain the amounts owed under the AFS contract. The contracting officer denied these claims, asserting that HUD's authority to rule was removed by plaintiffs' filing of the district court action.

Based on the facts asserted, plaintiffs argue that HUD breached the AFS contract and the duty of good faith and fair dealing in administering and failing to exercise the options on that contract.

### 3. Coinsurance contract

In counts 18 and 19, plaintiffs assert claims against HUD for failure to indemnify plaintiffs for claims of third parties arising out of their "Coinsurance contract." HUD awarded plaintiffs Coinsurance Contract No. HC–15801 on September 20, 1990. Among a variety of obligations, the contract required plaintiffs to manage certain loans in which HUD's coinsuring lender had defaulted. The Coinsurance contract included a provision obligating HUD to indemnify plaintiffs for all claims brought against plaintiffs arising out of their performance of the management function of the contract.

In 1994 AMI Affiliates filed a civil suit against plaintiffs, HUD, and certain employees of both for actions taken in the course of performance on the Coinsurance contract (the "AMI suit"). Plaintiffs incurred substantial costs and attorneys' fees in successfully defending this litigation. Although HUD initially paid on two of plaintiffs' invoices for reimbursement pursuant to the indemnification clause of the Coinsurance contract, HUD purportedly ignored later invoices as part of its broader retaliatory efforts against plaintiffs. Pursuant to a certified claim filed by plaintiffs on March 7, 1997, seeking such costs, HUD's contracting officer granted plaintiffs partial payment for outside legal fees, but denied the remainder of their request. Plaintiffs aver that $87,155.82, plus interest, remains due for legal fees and other expenses associated with the AMI suit.

In the course of their performance on the Coinsurance contract, plaintiffs and HUD transacted business with a group of joint ventures. In 1996 these joint ventures also filed a civil suit against plaintiffs, HUD's successor-in-interest, and others (the "Hillman suit"). Plaintiffs incurred costs in defending the Hillman suit in the amount of $9,465.00. HUD refused to reimburse plaintiffs. In response to a certified claim submitted on October 7, 1996, the contracting officer denied plaintiffs' request for such costs in its entirety.

Plaintiffs seek relief on a breach of contract theory for these amounts.

### 4. Asset Management contract

In counts 20 through 25, plaintiffs assert claims against HUD for failure to pay for services performed, bad-faith reduction of work, and bad-faith failure to exercise options under the Asset Management contract. HUD awarded plaintiffs Asset Management Contract No. DU100C000016787 on September 21, 1993. The Asset Management contract essentially extended plaintiffs' duties under the Coinsurance contract—which had expired by its own terms in September 1993—for a base term of one year, with four one-year options.

Under the Asset Management contract, HUD would issue monthly task orders identifying particular loans that required plaintiffs' review. The August 1995 task order issued by HUD included 274 separate projects. When HUD failed to issue a timely Septem-

ber task order, plaintiffs simply continued work on these 274 projects, plus two additional projects which HUD at an earlier date had requested be added to the September task orders. Two weeks later the September task order finally arrived with an unprecedented 107–project reduction. The project reduction allegedly was motivated by bad faith as a part of HUD's broader retaliatory efforts and cost plaintiffs $676,163.00 in lost profits over the course of 1995. HUD further refused to pay plaintiffs the $48,925.00 due for two weeks' work performed on the 107 projects later removed from the late September task order.

Another section of the Asset Management contract gave plaintiffs the exclusive right to perform multi-family mortgage due diligence services for HUD. However, on multiple occasions during the first two years of the contract, HUD ordered due diligence services from other suppliers. Plaintiffs estimate $16,605,480.00 in lost profits stemming from HUD's violation of this provision.

At the end of 1995, HUD did not exercise its option under the Asset Management contract. Plaintiffs charge that the reasons articulated for this decision were purely pretextual and that HUD's failure to exercise the remaining option years was motivated by bad faith. Plaintiffs estimate $3,854,200.00 in lost profits under the contract for option years 3 and 4.

In November 1996 and February 1997, plaintiffs submitted claims under the Asset Management contract for the above amounts. With the exception of a partial award for interest due as a result of HUD's failure to make timely payments for services provided by plaintiffs, the contracting officer refused to consider the claims citing a lack of authority by virtue of the district court action.

Plaintiffs now seek relief for these amounts on theories of breach of contract, constructive change, and breach of duty of good faith and fair dealing.

### 5. Delegated Processing contracts

In counts 26 through 28, plaintiffs assert claims against HUD for failure to order the minimum quantity under plaintiffs' Delegat-

ed Processing contracts. HUD awarded plaintiffs the Seattle Contract No. H10C9400500000 and the San Francisco Contract No. H09C93040900000 (the "Delegated Processing contracts")—on December 1, 1993, and August 1, 1993, respectively. Both contracts obligated plaintiffs to perform services that were prerequisites to HUD's issuing insurance commitments on multi-family property mortgages. Both contracts were one year in duration, with two one-year options.

The Seattle contract, as modified, obligated HUD to order the greater of one processing assignment per year or $10,000.00 in yearly delegated processing reviews from plaintiffs. In option year 1, HUD failed to order any services from plaintiffs and, pursuant to its retaliatory campaign, canceled option year 2. On November 15, 1996, plaintiffs filed a certified claim with the contracting officer demanding payment of $250,000.00, plus interest for the estimated damages resulting from HUD's breach. Citing a lack of authority over the claim by virtue of plaintiffs' district court action, the contracting officer refused to issue a final decision on this claim.

The San Francisco contract obligated HUD to order a minimum of $253,244.00 in yearly delegated processing reviews from plaintiffs. In option year 2, HUD requested only one $40,121.50 assignment from plaintiffs. On January 2, 1997, plaintiffs submitted a certified claim for the $213,122.50 deficiency, plus interest, to the contracting officer. The contracting officer denied this claim on the merits.

Plaintiffs now seek relief for these amounts on theories of breach of contract and breach of duty of good faith and fair dealing.

### 6. Physical Inspection contract

In counts 29 through 32, plaintiffs assert claims against HUD for failure to order inspections and reduction of work on plaintiffs' Physical Inspection contract. HUD awarded plaintiffs Physical Inspection Contract No. H07C94409200000 on April 22, 1994. Pursuant to this agreement, plaintiffs possessed the exclusive right to perform all physical

inspections of HUD-insured multi-family properties that HUD required in a four-state region. A minimum-quantity clause in the contract obligated HUD to order at least four physical inspections from plaintiffs in each year. The contract had a base term of one year, with four one-year options.

In late 1995 HUD ordered four physical inspections within plaintiffs' region from other suppliers. Plaintiffs estimate $2,775.50 in damages from this violation of the Physical Inspection contract.

During the first two years of the contract, HUD ordered approximately 600 physical inspections per annum from plaintiffs. Although HUD did exercise its second option on the contract, for the majority of year 3, it ordered no services from plaintiffs. In the final quarter of the third year, HUD ordered 41 inspections from plaintiffs. HUD did not exercise its options on the final two years of the Physical Inspection contract. Plaintiffs estimate $195,267.90 in damages from failure to order work at historic levels in year 3.

Based on the foregoing facts, on January 16, 1997, plaintiffs submitted a certified claim to the contracting officer to recover these amounts. The contracting officer refused to issue a final decision, citing HUD's lack of authority to decide it by virtue of plaintiffs' district court action.

Plaintiffs now seek relief for these amounts on breach of contract and constructive change theories.

### 7. Due Diligence II contract

In counts 33 and 34, plaintiffs assert claims against HUD for failure to award plaintiffs a Due Diligence II contract. On February 17, 1995, HUD issued a solicitation that contemplated the award of multiple contracts for due diligence services related to HUD's note sale program to qualifying firms (the "Due Diligence II contracts"). Plaintiffs—made eligible by virtue of a partnership with a qualifying firm—submitted a proposal. After determining that plaintiffs' proposal was in the competitive range HUD's Source Evaluation Board recommended that plaintiffs be awarded a Due Diligence II contract. Unrelenting in her alleged efforts to ruin plaintiffs, Ms. Dunlap, in contravention of HUD procedures, overruled the Board's recommendation and awarded the contract to another team. According to plaintiffs, this team was not a qualifying firm.

On February 3, 1997, plaintiffs submitted a certified claim to the contracting officer requesting a revised payment of $7,400,-000.00—representing their anticipated lost profits from not being awarded the contract. The contracting officer refused to hear plaintiffs' claim on the grounds that it lacked authority by virtue of plaintiffs' district court action.

Plaintiffs now seek relief for these amounts as a breach of an implied contract to consider proposals fairly and as a Fifth Amendment taking.

### 8. Technical Assistance contract

In counts 35 through 37, plaintiffs assert claims against HUD for reduction of work and a bad-faith, directed subcontract arrangement with respect to the Technical Assistance contract. HUD awarded plaintiffs Technical Assistance Contract No. DU 100C000018485 on January 2, 1992. Under this agreement plaintiffs provided certain HUD divisions with technical assistance. The Technical Assistance contract consisted of a base year, with three one-year options.

In the fall of 1994, HUD initiated the Special Workout Assistance Team ("SWAT") program for which it needed various services performed. The existing Technical Assistance contract obligated HUD to order these services from plaintiffs. Ms. Dunlap, however, informed plaintiffs that these services would instead be performed by The Kerry Corporation, which was to be installed as plaintiffs' subcontractor on the project. When HUD threatened more damaging work reductions, plaintiffs agreed to this arrangement. On November 15, 1996, plaintiffs submitted a claim to the contracting officer seeking a revised amount of $36,113.25 plus interest—plaintiffs' expected revenues on the SWAT work done as performed by The Kerry Corporation. The contracting officer denied these claims in their entirety.

Plaintiffs now seek relief for these amounts on theories of breach of contract, constructive change, and breach of duty of good faith and fair dealing.

#### 9. Bid and proposal costs

Plaintiffs charge that HUD's retaliatory efforts effectively precluded them from winning any contracts throughout the period at issue in this case. In count 38, on a theory of breach of implied contract to consider proposals fairly, plaintiffs seek to recover costs for preparing, submitting, and negotiating bid proposals that were not fairly considered by HUD. Plaintiffs estimate damages at $494,833.00.

#### 10. Destruction of plaintiffs' business

According to plaintiffs, HUD's habitual retaliatory actions, orchestrated by Ms. Dunlap, destroyed plaintiffs' business. In 1994, before the alleged illegalities began, plaintiffs were worth approximately $45,540,000.00. In count 39 plaintiffs seek to recover this amount for the destruction of their business as a Fifth Amendment taking.

### DISCUSSION

When a federal court reviews the sufficiency of the complaint, pursuant to a motion to dismiss for lack of subject matter jurisdiction, "its task is necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* To this end, the court must accept as true the facts alleged in the complaint, *see Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988), and must construe such facts in the light most favorable to the pleader. *See Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995) (holding courts obligated "to draw all reasonable inferences in plaintiff's favor"). It is well-settled doctrine that a complaint will not be dismissed for lack of subject matter jurisdiction "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Therefore, when the facts alleged in the complaint reveal "any possible basis on which the nonmovant might prevail, the motion must be denied." *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed. Cir.1988) (citations omitted).

The burden of proving that the Court of Federal Claims has subject matter jurisdiction over a claim rests with the party seeking to invoke its jurisdiction. *See Reynolds,* 846 F.2d at 748. At the pleading stage, general factual allegations may suffice to meet this burden, for on a motion to dismiss the court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. National Wildlife Fed.,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). However, because proper jurisdiction is not merely a pleading requirement, "but rather an indispensable part of the plaintiff's case, each element [of subject matter jurisdiction] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citing *National Wildlife Fed.,* 497 U.S. at 883–89, 110 S.Ct. 3177; *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 114–15 n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 527 n. 6, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (Brennan, J., dissenting)). Therefore, as the party invoking federal jurisdiction in the action, plaintiff bears the burden of pleading the facts upon which the court's jurisdiction depends. *See McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

#### 1. The Contract Disputes Act

Defendant asserts that the court lacks jurisdiction over plaintiffs' claims by virtue of the jurisdictional restrictions of the Contract Disputes Act of 1978, 41 U.S.C.A. §§ 601–613 (West 1987 & Supp.1999) (the "CDA"), as interpreted in *Sharman Company, Inc. v. United States,* 2 F.3d 1564 (Fed.Cir.1993), *overruled in part on other grounds by Re-*

*flectone, Inc. v. Dalton,* 60 F.3d 1572 (Fed. Cir.1995).

■ In order to provide a comprehensive uniform statutory scheme for judicial and administrative resolution of government contract claims, Congress enacted the CDA. Section 605(a) of that statute provides that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." This language has been construed to require a "final decision" by the contracting officer as a " 'jurisdictional prerequisite' to further legal action." *Sharman,* 2 F.3d at 1568 (quoting 41 U.S.C. § 605(a)). Accordingly, a CDA action may not be maintained in the Court of Federal Claims unless:

> (i) the contracting officer has issued a final decision on the contractor's claim, 41 U.S.C. § 605(b), *Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1573 (Fed.Cir.1995), or (ii) the contracting officer has failed to issue a final decision on the contractor's claim or to notify the contractor of the time within which a decision will be issued, and at least 60 days have passed since the date the claim was submitted for a decision, 41 U.S.C. § 605(c)(5); *Do–Well Mach. Shop, Inc. v. United States,* 870 F.2d 637, 640 (Fed.Cir.1989). In the latter case, the claim is "deemed denied." *Pathman Constr. Co. v. United States,* 817 F.2d 1573, 1575 (Fed.Cir.1987).

*Case, Inc. v. United States,* 88 F.3d 1004, 1008–09 (Fed.Cir.1996). If neither jurisdictional requirement is satisfied, the court cannot proceed to assess the merits of a plaintiff's claims.

By their own admissions, plaintiffs never submitted a claim to the contracting officer for loss of intellectual property, bid costs, or destruction of business. Nonetheless, plaintiffs attempt to avoid the harsh consequence of the CDA's jurisdictional prerequisite, with respect to the claims for loss of intellectual property, by asserting that these claims do not "relat[e] to a contract," 41 U.S.C. § 605(a), and thus are not subject to the CDA or its jurisdictional bar.

■ The scope of the CDA is limited to express or implied contracts to which the Government is a party for the procurement of property or services. *See G.E. Boggs & Assocs., Inc. v. Roskens,* 969 F.2d 1023, 1026 (Fed.Cir.1992) (citing *Coastal Corp. v. United States,* 713 F.2d 728, 730 (Fed.Cir.1983)). In determining the applicability of the CDA, the courts have acknowledged the need for statutory interpretation to "do justice to the realities of the situation." *Institut Pasteur v. United States,* 814 F.2d 624, 627 (Fed.Cir. 1987) (quoting *Texas State Comm'n for the Blind v. United States,* 796 F.2d 400, 406 (Fed.Cir.1986)). To this end the Federal Circuit has repeatedly referenced the legislative history and policy considerations underlying the enactment of the CDA. *See generally Janowsky v. United States,* 989 F.2d 1203, 1993 WL 36863 (Fed.Cir.1993) (table); *Institut Pasteur,* 814 F.2d 624; *Coastal Corp.,* 713 F.2d 728; *Airborne Data, Inc. v. United States,* 702 F.2d 1350 (Fed.Cir.1983).

■ Congress enacted the CDA "to promote economy, efficiency and effectiveness in the government's procurement of goods." *G.E. Boggs,* 969 F.2d at 1027. In *Institut Pasteur,* which plaintiffs put forward as their linchpin case, the Federal Circuit considered the applicability of the CDA to an agreement between a foreign research institute and the National Cancer Institute to transfer AIDS-related virus samples. Upon reviewing the associated regulations, that court held that the critical components of a CDA contract were "a buyer-seller relationship and an expenditure of government funds." *Institut Pasteur,* 814 F.2d at 627. As neither was present in that case, the agreement fell outside the ambit of the CDA and plaintiff was not prejudiced for failing to submit its claim to the contracting officer before pursuing judicial action. The court also relied on the "collaborative" nature of the parties' relationship and the strong public policy disfavoring arduous regulations in matters of national health when it held that the transaction "was closer to being donative in nature than it was to the contracts for procurement of property or services which Congress contemplated including within the scope of the [CDA]." *Id.* at 628.

The transactions at issue in this case bear almost no similarity to the virus samples exchanged in *Institut Pasteur*. The relationship between plaintiffs and HUD was plainly a buyer-seller relationship—not one of collaborative partners. Each of their agreements came as a result of a competitive bidding process and required the expenditure of government funds. These are the hallmarks of a CDA contract. *See id.* at 626–28. Plaintiffs' contention that the transactions of intellectual property rights were "donative" in nature is belied by the assertion, reiterated many times in the complaint, that they only provided HUD with data downloads under threat of further retaliation. Finally, plaintiffs have articulated no policy reason—such as the urgency of fighting a deadly disease—for excluding the agreements at issue from CDA coverage.

That *Institut Pasteur* evolved from an unauthorized transfer of intellectual property rights, a fact in which plaintiffs place great stock, is irrelevant to that holding. The case was decided upon the court's assessment of the essential character of the parties' relationship as collaborators. (No language in *Institut Pasteur* supports the proposition that the CDA does not apply to agreements for transfer of intellectual property rights, as such.) Each of the other cases cited by plaintiffs in support of this proposition—*Padbloc Co. v. United States*, 161 Ct.Cl. 369, 1963 WL 8492 (1963), and *Research, Analysis, & Development, Inc. v. United States*, 8 Cl.Ct. 54 (1985)—involved the transfer of information contained in a bid proposal. They are equally unavailing because, in this case, the information was transferred in the context of a pre-existing contractual relationship between the parties.

Plaintiffs' claims for loss intellectual property are within the scope of CDA coverage and subject to its jurisdictional requirements.[4] As plaintiffs did not submit these claims to the contracting officer, further action by the court is precluded at this time.

### 2. Compliance with the CDA

With respect to claims arising under the AFS contract, the Coinsurance contract, the Asset Management contract, both Delegated Processing contracts, the Physical Inspection contract, the Due Diligence II contract, and the Technical Assistance contract, plaintiffs argue that they have complied with the jurisdictional requirements of the CDA. In each of these claims, the contracting officer either denied plaintiffs relief or refused to review the matter, ruling that plaintiffs' district court action had the effect of removing HUD's authority, pursuant to the holding in *Sharman*.

Under 28 U.S.C. § 516 (1993), "the conduct of litigation in which the United States . . . is a party . . . is reserved to officers of the Department of Justice, under the direction of the Attorney General." In *Sharman* the Federal Circuit clarified the applicability of this statutory provision to CDA claims, ruling that "[o]nce a claim is in litigation, the Department of Justice gains exclusive authority to act in the pending litigation." *Sharman*, 2 F.3d at 1571. Litigation becomes pending upon the filing of a complaint with the court. *See id.* The exclusive authority given to the Department of Justice under this provision divests the contracting officer of any authority to rule on the claim. *See Case*, 88 F.3d at 1009 (citing *Sharman*, 2 F.3d at 1571).

### 1) *Claims that the contracting officer denied*

■ With respect to the claims that the contracting officer denied—whether in whole or in part—plaintiffs assert that these rulings satisfy the requirements of the CDA to authorize jurisdiction in the Court of Federal Claims.[5] A final decision by the contracting

---

4. Plaintiffs seek relief for loss of intellectual property on breach of contract, copyright infringement, and taking theories. The legal theory upon which a claim is based is irrelevant to the applicability of the CDA to a given set of facts. Plaintiffs cannot avoid the jurisdictional requirement of the CDA merely by reasserting their claims under alternative legal theories.

5. For purposes of this issue only, the court assumes, without deciding, that these claims were not put into litigation by plaintiffs' district court action.

officer is a jurisdictional prerequisite to action by the Court of Federal Claims. *See* 41 U.S.C. § 605(a), *Sharman,* 2 F.3d at 1568 (citations omitted). Closely related to this rule of jurisdiction "is the principle that an invalid contracting officer's decision may not serve as the basis for a CDA action." *Case,* 88 F.3d at 1009 (citing *United States v. Grumman Aerospace Corp.,* 927 F.2d 575, 579 (Fed.Cir.), *cert. denied,* 502 U.S. 919, 112 S.Ct. 330, 116 L.Ed.2d 270 (1991)). "A contracting officer's final decision is invalid when the contracting officer lacked authority to issue it." *Id.* (citations omitted). The contracting officer is divested of authority to render a decision at the moment a complaint is filed. *See Sharman,* 2 F.3d at 1571.

■ The claims which the contracting officer denied are, by plaintiffs' own admission, incorporated into the complaint filed with the court.[6] That complaint was filed on August 16, 1996. This action vested exclusive authority over the case with the Department of Justice and thereby extinguished the contracting officer's prerogative to issue a decision on plaintiffs' claims. Plaintiffs, however, did not submit their claims to the contracting officer until after this litigation was filed.[7] Accordingly, the final decisions of the contracting officer were invalid and cannot serve as a basis for this court's jurisdiction.[8]

### 2) *Claims on which the contracting officer refused to rule*

With respect to the claims on which the contracting officer refused to rule, plaintiffs assert that the contracting officer misapplied *Sharman* and that HUD's authority was not divested by plaintiffs' district court action. Having failed to issue a final decision on these claims within 60 days of submission, the argument goes, the claims are to be "deemed denied," *Pathman Constr. Co. v. United States,* 817 F.2d 1573, 1575 (Fed.Cir. 1987), and are thus ripe for review by the Court of Federal Claims. Plaintiffs' contentions are flawed for at least three independent reasons.

1. The contracting officer denied each of plaintiffs' claims, ruling that HUD's authority to review them had been divested by virtue of plaintiffs' June 1996 complaint filed in district court. Plaintiffs, however, argue that the claims before the contracting officer were fundamentally different from those at issue in the district court action because they "sought completely different relief." Plf's Br. filed Sept. 8, 1998, at 23. Thus, the district court complaint could not have put them into litigation and could not have divested the contracting officer of authority to act.

Plaintiffs' contention elevates form over substance. A central holding of *Sharman* is that the label plaintiffs ascribe to a claim for relief is irrelevant. *See Sharman,* 2 F.3d at 1571. Claims are the same, for *Sharman* purposes, when they allege entitlement to the same relief based upon the same set of operative facts. *See id.* "That the legal theories are different does not mean that the relief is different." *Dico, Inc. v. United States,* 48 F.3d 1199, 1203 (Fed.Cir.1995). This rule applies "even if the operative facts support different legal theories which cannot all be

---

**6.** In order for the Court of Federal Claims to have jurisdiction over a CDA claim, the contracting officer must have issued a final decision on that claim prior to it being filed. Plaintiffs seeks to rely on the contracting officer's denials as final decisions. Thus, plaintiffs cannot argue, without undermining their basis for jurisdiction, that the denied claims are fundamentally different from those asserted in the complaint.

**7.** In fact, plaintiffs' first claim to the contracting officer was not submitted until October 7, 1996.

**8.** Plaintiffs argue, without support, that jurisdiction over their claims first asserted in their Second Amended Complaint must be assessed as of the date of that Amendment—some 17 months after the action was commenced—because the

events which gave rise to these claims did not occur until after their original filing. However, "[t]he existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed." *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 830, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989). This means that while amendments of a complaint to cure defective allegations of jurisdiction are permitted, amendments to remedy actual jurisdictional defects are not. *See id.* Though plaintiffs' additional claims may satisfy the jurisdictional requirements of the CDA, post-filing conduct cannot create jurisdiction which did not exist at the outset of this litigation. *See Lujan,* 504 U.S. at 571 n. 4, 112 S.Ct. 2130.

brought in one court." *Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1567 (Fed.Cir.1988), *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989). Thus, plaintiffs cannot trump the Department of Justice's exclusive authority over pending litigation against the United States by redacting the legal label used to support relief in the complaint, replacing it with an alternative legal theory, and resubmitting it to the contracting officer.

Plaintiffs' claims before the contracting officer and those asserted in the district court complaint allege identical operative facts and assert entitlement to the same relief. That plaintiffs sought this relief under the label money damages from the contracting officer and as injunctive relief from the district court is of no consequence to this analysis. It is further irrelevant that plaintiffs could not have asserted a claim for money damages against the Government in their district court action because the United States has only waived sovereign immunity for monetary damages in the Court of Federal Claims. *See id.* Therefore, plaintiffs' claims were "in litigation" when submitted to the contracting officer, and the contracting officer correctly decided that HUD's authority to rule on those claims had been divested by virtue of the holding in *Sharman.* Again, as the "contracting officer lack[ed] authority to issue a final decision on a claim, there can be no valid deemed denial of the claim so as to confer CDA jurisdiction under 41 U.S.C. § 605(c)(5)." *Case,* 88 F.3d at 1009.

2. Even if plaintiffs' claims before the contracting officer could be considered fundamentally different from those at issue in the district court action—based upon their divergent legal theories—still cannot elude the jurisdictional bar of 28 U.S.C. § 516. The contracting officer held that HUD's authority to rule had been divested by virtue of plaintiffs' filing with the district court. Of course, the rule of *Sharman* applies with equal force when a claim is put into litigation in the Court of Federal Claims. *See, e.g., Sharman,* 2 F.3d at 1566. Although plaintiffs' complaint was filed in this court on August 16, 1996, no claim was filed with the contracting officer until well after that date.

The complaint filed in court and the complaint submitted to the contracting officer recite identical operative facts. Likewise, both complaints seek monetary relief. Thus, plaintiffs' claims are mirror images. As the "contracting officer lack[ed] authority to issue a final decision on [the] claim[s], there can be no valid deemed denial of the claim so as to confer CDA jurisdiction under 41 U.S.C. § 605(c)(5)." *Case,* 88 F.3d at 1009.

3. Even assuming that the contracting officer retained authority to rule on plaintiffs' claims, the court could not assert jurisdiction on the ground that the claims were "deemed denied" by a lapse of time. Pursuant to the CDA, plaintiffs may pursue legal action in the Court of Federal Claims when the contracting officer has failed to issue a final decision on the contractor's claim or to notify the contractor of the time within which a decision will be issued, and at least 60 days have passed since the date the claim was submitted for a decision. *See* 41 U.S.C. § 605(c)(5). In such a case, the claims are to be "deemed denied." *Pathman,* 817 F.2d at 1575. Thus, in the situation in which a contracting officer refuses to rule on a claim—asserting incorrectly that the agency has been divested of authority by virtue of 28 U.S.C. § 516—and the 60–day period has expired, plaintiffs would be able to file a CDA action in the Court of Federal Claims on the theory that the intervening lapse constituted a deemed denial. *See, e.g., Case,* 88 F.3d at 1004. However, the facts before this court do not comport with this scenario.

Plaintiffs rely on the fact that the 60–day time period had elapsed by the time defendant's motion to dismiss was filed. This fact, although true, is not the test for this court's jurisdiction. It is an elementary rule of civil procedure that "jurisdiction must be . determined 'under the actual circumstances existing at the time a complaint is filed.' " *Sharman,* 2 F.3d at 1569 (quoting *Sharman Co. v. United States,* 24 Cl.Ct. 763, 769 (1991)). While the complaint may be amended to cure defective allegations of jurisdiction, post-filing events cannot create jurisdiction that did not exist at the outset of the litigation. *See Newman–Green,* 490 U.S. at 830, 109 S.Ct. 2218. At the time plaintiffs

filed their complaint in the Court of Federal Claims, no claim had been submitted to the contracting officer. The fact that the contracting officer thereafter refused to issue a decision and the 60–day period elapsed does not create a deemed denial.

### CONCLUSION

Based on the foregoing, defendant's motion to dismiss for lack of subject matter jurisdiction is granted, and the Clerk of the Court shall dismiss the Second Amended Complaint without prejudice.[9]

**IT IS SO ORDERED.**

9. Having dismissed plaintiffs' claims in their entirety pursuant to the holding in *Sharman,* it is unnecessary for this court to consider defendant's alternative theories for dismissal.