**SIKORSKY AIRCRAFT CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Nos. 09–844C, 10–741C.**

United States Court of Federal Claims.

July 18, 2012.

---

Jeffrey A. Hall, Bartlit Beck Herman Palenchar & Scott LLP, Chicago, Illinois, for plaintiff. Of counsel were Shayna S. Cook, Allison W. Freedman, and Georgia N. Alexakis, Bartlit Beck Herman Palenchar & Scott LLP, Chicago, Illinois, and Karen L. Manos, Gibson, Dunn & Crutcher LLP, Washington, D.C.

James W. Poirier, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Stuart F. Delery, Acting Assistant Attorney General, Jeanne A. Davidson, Director, Steven J. Gillingham, Assistant Director, and Kimberly I. Kennedy, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

The United States ("the government") claims that Sikorsky Aircraft Corporation ("Sikorsky") owes the government approximately $80 million, stemming from the accounting method for indirect costs in place at Sikorsky from 1999 to 2005. *See Sikorsky Aircraft Corp. v. United States,* 102 Fed.Cl. 38, 40 (2011). According to the government, Sikorsky's accounting method misallocated

overhead costs to Sikorsky's government contracts in contravention of the Cost Accounting Standards ("CAS") set out at 48 C.F.R. ("FAR") Chapter 99. Sikorsky denies that its accounting practices were ever noncompliant and has also raised affirmative defenses to the government's claim. At issue presently are the government's motions for summary judgment on two of those affirmative defenses. First is Sikorsky's affirmative defense that the government's claim is barred by the six-year statute of limitations found in the Contract Disputes Act of 1978 ("CDA"). *See* 41 U.S.C. § 7103(a)(4)(A). Sikorsky's defense essentially is that the government knew of the purported CAS violation by 1999, so its claim asserted in 2008 came too late. The government's motion contends that its claim did not accrue until either 2004, when the contracting officer monitoring Sikorsky received an audit showing a potential violation, or 2008, when the contracting officer completed all the administrative steps necessary before bringing the government's claim. The government's second motion relates to Sikorsky's affirmative defense that an earlier accord and satisfaction precludes the government's claim. According to this defense, in 2005 Sikorsky and the government's contracting officer struck a deal: Sikorsky agreed to change its accounting system in 2006, and the officer agreed not to pursue any possible noncompliance attributable to the system in place from 1999 to 2005. The government's motion contends that there was no such agreement, or if there was, that it did not extend to cost impacts prior to 2006. Both of the government's motions have been briefed and argued and are now ready for disposition.[1]

1. The motions were submitted in anticipation of a trial scheduled to commence on October 22, 2012, relating to factual issues attendant to application of the CAS. *See Sikorsky*, 102 Fed.Cl. at 58–60.

2. The Contract Disputes Act was recently recodified at 41 U.S.C. §§ 7101–7109, replacing 41 U.S.C. §§ 601–613. *See* Act of Jan. 4, 2011, Pub.L. No. 111–350, sec. 3, §§ 7101–7109, sec. 7(b), 124 Stat. 3677, 3816–26, 3860.

3. The pertinent portion of the Tucker Act as amended provides that:

## BACKGROUND

### I. The Legal Framework

The government's motions rely on the statutes and regulations governing the initiation and resolution of contract disputes between the federal government and its contractors. In particular, the briefs respecting the motions address at length the provisions regulating the duties of federal contracting officers. Many of the events occurring prior to the present litigation, especially the actions of various government employees, become somewhat understandable when viewed as following—or not following, as the case may be—the processes set out by these statutes and regulations.

The overarching statute in the present dispute is the CDA, codified at 41 U.S.C. §§ 7101–7109.[2] Contractors and the government both can submit claims under the CDA. *See* 41 U.S.C. § 7103. Initially, a claim is presented to or by a contracting officer, who is obliged to render a written decision on the claim. 41 U.S.C. § 7103(a)(1), (3). A contractor may appeal a contracting officer's decision on a claim to the proper board of contract of appeals within 90 days, or, as was done here, bring an action in this court within one year. *Id.* § 7104; *see also* 28 U.S.C. § 1491(a)(2).[3] Concomitantly, if a contractor or the government fails to obtain a contracting officer's written decision, then this court is without jurisdiction to hear the underlying claim. *See Raytheon Co. v. United States*, 105 Fed.Cl. 236, 286–87, 297–98 (2012).

Crucially, the CDA sets out a statute of limitations for the initial submission of a claim. "Each claim by a contractor against the [f]ederal [g]overnment relating to a con-

The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of th[e Contracts Disputes] Act[, codified at 41 U.S.C. § 7103].
28 U.S.C. § 1491(a)(2) (last sentence).

tract and each claim by the [f]ederal [g]overnment against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 7103(a)(4)(A). The CDA itself does not define "accrual," but it is defined in the FAR, Chapter 1, Part 33. *See Raytheon Co. v. United States,* 104 Fed.Cl. 327, 330–31 (2012); *cf. H.L. Smith, Inc. v. Dalton,* 49 F.3d 1563, 1564 (Fed.Cir.1995). According to the regulation:

> *Accrual of a claim* means the date when all events, that fix the alleged liability of either the [g]overnment or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, monetary damages need not have been incurred.

FAR § 33.201.

FAR Part 33 also sets out the general procedures the government must follow when a potential claim has accrued. "[C]ontracting officers are authorized, within any specific limitations of their warrants, to decide or resolve all claims arising under or relating to a contract subject to the [CDA]." FAR § 33.210. "The [g]overnment's policy is to try to resolve all contractual issues in controversy by mutual agreement at the contracting officer's level. Reasonable efforts should be made to resolve controversies prior to the submission of a claim." FAR § 33.204. However, if a claim by or against a contractor is submitted and it "cannot be satisfied or settled by mutual agreement[,] . . . a decision [by the contracting officer] on the claim is necessary." FAR § 33.211(a). In accord with the CDA's statute of limitations, "[t]he contracting officer shall issue a written decision on any [g]overnment claim initiated

against a contractor within 6 years after accrual of the claim, unless the contracting parties agreed to a shorter time period." FAR § 33.206(a).

FAR Part 30 establishes procedures to be followed in the administration of contracts subject to the CAS.[4] First, for such contracts, the contractor must submit a "Disclosure Statement," which is "a written description of a contractor's cost accounting practices and procedures." FAR § 9903.202–1(a) (incorporated by FAR § 30.202–1); *see also* FAR § 52.230–2(a)(1). An updated Disclosure Statement must also be submitted when "extensive changes require it." FAR § 9903.202–3 (incorporated by FAR § 30.202–3); *see also* FAR § 52.230–6(b).[5] A copy of the Disclosure Statement must be submitted to the cognizant federal auditor and to the cognizant federal agency official ("CFAO") administering the CAS respecting the contractor's CAS-covered contract or contracts. FAR § 9903.202–5(b) (incorporated by FAR § 30.202–5); *see* FAR § 30.001. "The cognizant auditor is responsible for conducting reviews of Disclosure Statements for adequacy and compliance," FAR § 30.202–6(c), and "[t]he CFAO is responsible for issuing determinations of adequacy and compliance of the Disclosure Statement," FAR § 30.206–6(d). A Disclosure Statement is first reviewed for adequacy and then for compliance. The auditor "[c]onduct[s] a detailed compliance review to ascertain whether or not the disclosed practices comply with [the CAS and] . . . [a]dvise[s] the CFAO of the results." FAR § 30.202–7(b)(1)(i)–(ii). Based on this advisement, the CFAO "make[s] a determination of compliance or

---

**4.** The Cost Accounting Standards, codified at FAR Chapter 99, Subchapter B, Part 9904, are "designed to achieve uniformity and constancy in the cost-accounting principles followed by defense contractors and subcontractors under [f]ederal contracts." *Allegheny Teledyne Inc. v. United States,* 316 F.3d 1366, 1370 (Fed.Cir.2003). In essence, the standards determine what contractor costs may be allocated to government contracts, and how those costs should be allocated. The aim of the standards is to allow a contractor to charge to government contracts only those costs of doing business that should be fairly attributed to the performance of those con-

tracts. *See generally* Darrell J. Oyer, *Accounting for Government Contracts—Cost Accounting Standards,* § 1.01 to .05 (2010). At issue ultimately in this case is Sikorsky's compliance with CAS 418, codified at FAR §§ 9904.418–10 to 9904.418–63. *See Sikorsky,* 102 Fed.Cl. at 48–58.

**5.** Such changes, unless deemed desirable to the government, must also be accompanied by a general dollar-magnitude proposal, *i.e.,* a cost-impact proposal, estimating the difference in costs to the government caused by the change. FAR § 30.604(b)(1)(i).

take[s] action regarding a report of alleged noncompliance in accordance with [FAR § ] 30.605(b)." FAR § 30.202–7(b)(2).

In the case of an alleged noncompliance, the CFAO's actions involve several steps. First, "[w]ithin 15 days of receiving a report of alleged noncompliance from the auditor, the CFAO shall ... [n]otify the auditor that the CFAO disagrees ... [or] [i]ssue a notice of potential noncompliance to the contractor." FAR § 30.605(b)(1). If a notice is issued, the contractor has 60 days to respond. FAR § 30.605(b)(2). After this time has elapsed, and in light of any response sent by the contractor, the CFAO then must "[m]ake a determination of compliance or noncompliance" and notify the contractor. FAR § 30.605(b)(3).

This compliance determination leads to one of three further procedures. If the practice is determined to be compliant, no further action is required. Similarly, if the practice is determined to be noncompliant but has no appreciable effect on the underlying contracts—that is, "the cost impact is immaterial"—then little action is required. FAR § 30.605(b)(4). The CFAO simply urges the contractor to change the noncompliant practice and warns that if the contractor does not, then "the [g]overnment reserves the right to make appropriate contract adjustments should the noncompliance become material in the future." FAR § 30.605(b)(4)(i)(B).

If the noncompliance is determined to be material, however, then more steps must be followed. Initially, within 60 days of the notice of noncompliance, the contractor must submit "a description of any cost accounting practice change needed to correct [the] noncompliance." FAR § 30.605(c)(1); see also FAR § 52.230–6(b)(4)(ii). Provided the change itself is deemed adequate and compliant, the CFAO must then take action to resolve any money potentially owed the government under the past, noncompliant accounting practice. The CFAO first must ask the contractor for a "general dollar magnitude" or "[d]etailed cost-impact" proposal. FAR § 30.605(c)(2)(i)(B), (d), (f); see also FAR § 52.230–6(c)(1)–(2). Such a proposal is meant to estimate the cost impact of the noncompliance, that is, "the total increase or decrease in contract and subcontract prices and cost accumulations." FAR § 30.605(d)(2)(iii); see FAR § 30.605(d)(4). If the contractor fails to submit a cost-impact proposal, then the CFAO may estimate the cost impact himself and either withhold payments under the disputed contracts or "[i]ssue a final decision ... and unilaterally adjust the contract(s)." FAR § 30.604(i); FAR § 30.605(i); see also FAR § 52.230–6(j). If, instead, the contractor does submit a cost-impact proposal, then either of two further actions is required. If the cost impact is shown to be immaterial, then no money is owed and the government reserves the right to make future adjustments if the noncompliance becomes material. FAR § 30.605(e) (referencing FAR 30.605(b)(4)). If the cost impact proves to be material, however, then the CFAO must "[n]egotiate and resolve the cost impact." FAR § 30.605(e)(1); see FAR § 30.606(a)(1), (b)(1). If the CFAO and the contractor do not agree "on the amount of the cost impact or the contract adjustments," then the CFAO must "issue a final decision ... and unilaterally adjust the contract(s)." FAR § 30.606(c)(6)(ii).

In addition to FAR Parts 30 and 33, FAR § 52.230 plays a role in CAS administration. FAR § 52.230 consists of contract clauses incorporated into CAS-covered contracts. See FAR § 30.201–4. These clauses essentially mirror some of the procedures found at FAR Part 30 by obligating the contractor to comply with the government's requirements and requests made pursuant to its authority under FAR Part 30. Those contractual obligations include the requirements to submit a Disclosure Statement, FAR § 52.230–2(a)(1), to correct a practice found noncompliant, FAR § 52.230–6(b)(4), and to submit a cost-impact estimate when asked by the CFAO, FAR § 52.230–6(c). FAR § 52.230 also contains clauses confirming that a dispute over CAS compliance is a dispute under the CDA, FAR § 52.230–2(b); see also Raytheon, 105 Fed.Cl. at 286–87, 2012 WL 2878605, at *48 ("A government claim for an equitable adjustment under FAR [§ ] 52.230–2 is subject to the CDA."), and that the government may issue a final decision if a contractor fails to

submit timely a cost-impact proposal related to a noncompliance, FAR § 52.230–6(j).

## II. The Facts

The government contends that no material facts exist to substantiate Sikorsky's statute-of-limitations and accord-and-satisfaction affirmative defenses. The statute-of-limitations defense depends in large part on events that occurred in 1999. The question is whether those events, which related to Sikorsky's accounting change effective at the beginning of that year, and the government's first audit of that change, provided notice to the government of a potential claim. In contrast, the accord-and-satisfaction defense depends in large part on events that occurred in 2004. In 2004, the government audited Sikorsky's accounting change a second time, and the question is whether the negotiations that followed between Sikorsky and the government resolved any potential government claim.

### A. The 1999 Accounting Change, Audit, and Review

On August 13, 1998, Sikorsky submitted a revised cost-accounting Disclosure Statement to Joan R. Sherwood, its Corporate Administrative Contracting Officer ("CACO").[6] *See* Def.'s Mot. for Summary Judgment upon the Affirmative Defense Based upon the Statute of Limitations ("Def.'s Mot. for Judgment on Limitations Defense") App. at 1–2. The changes disclosed would take effect on January 1, 1999. *Id.* App. at 2. Sikorsky did not provide a cost-impact proposal with its Disclosure Statement, stating that one would be provided separately. *Id.* The Disclosure Statement was reviewed for adequacy and compliance by the Defense Contract Audit Agency ("DCAA"), including Robert Boyer, a technical specialist, and A.J. O'Falt, the resident auditor. The Disclosure Statement soon passed adequacy review. *See id.* App. at 38–43.

The compliance review was less swift. According to handwritten notes by Mr. Boyer, on February 4, 1999 a meeting was held regarding the cost impact of Sikorsky's ac-

counting change. *See* Pl.'s Opp'n to Def.'s Mot. for Judgment on Limitations Defense ("Pl.'s Opp'n to Judgment on Limitations Defense") Ex. E, at 1. The notes state that present at the meeting were Sikorsky representatives, DCAA officials including Messrs. Boyer and O'Falt, and the CACO, Ms. Sherwood. *Id.* Mr. Boyer wrote that the cost impact of the accounting change appeared to be $11.8 million in 2001 and $54.1 million in 2008, and that he "emphasized that total cost-impact 1999–2003 per [Sikorsky] is $140 million increased costs for the [government]." *Id.* Ex. E, at 3. Mr. Boyer also wrote, "Auditor showed these figures to [C]ACO at meeting." *Id.*

On April 22, 1999, DCAA submitted to Sikorsky a draft audit of the revised Disclosure Statement. Def.'s Mot. for Judgment on Limitations Defense App. at 44. The draft audit found that Sikorsky's revised accounting practice was "in noncompliance with CAS 418," *id.* App. at 46, resulting in costs to the government of approximately $5 million in 2001 and $32 million in 2008, *id.* App. at 48; *see also* Pl.'s Opp'n to Judgment on Limitations Defense Ex. B (Dep. of Robert Boyer (July 20, 2011)), at 185:15 to 186:4.

Sikorsky responded to the draft audit on June 28, 1999. Def.'s Mot. for Judgment on Limitations Defense App. at 62–63. Sikorsky wrote that its accounting change would have resulted in an increased cost to the government of approximately $1.7 million in 1998. *Id.* App. at 62. Sikorsky also wrote, "As discussed during our last meeting, it is recommended that during the latter part of this year we reassess the [accounting change] to determine the extent of the impact on future years. We will then make a determination regarding future impacts." *Id.* App. at 63.

On July 22, 1999, DCAA issued its final audit and a supplemental audit of Sikorsky's accounting change. The audit concluded:

> Our audit procedures disclosed no instances [of] noncompliance with CAS 418. However, instances of noncompliance not

---

6. The FAR and the parties' documents variously refer to the "contracting officer," the "CACO," the Divisional Administrative Contracting Officer ("DACO"), the Administrative Contracting Offi-

cer ("ACO"), and the "CFAO." These titular distinctions make no difference for purposes of this opinion, as all refer to the same responsible government officer.

detected during this audit may be discovered during our continuous audit of the contractor's cost accounting practices.

This opinion is primarily based on the fact that there is no material impact on CAS covered contracts for CY[, *i.e.,* calendar year] 1999 due to the [accounting] change....

... DCAA and the contractor have agreed to reassess the impact of this change on future years during the last half of CY 1999. The future production of RAH–66 Commanche [sic] and S–92 helicopters coupled with Sikorsky's announced and unannounced restructuring plans may alter our opinion regarding the present immateriality of this change on CAS covered contracts.

We accordingly recommend that you [Ms. Sherwood] notify Sikorsky that our opinion regarding its compliance with CAS 418 is based on the fact that its above-described cost accounting change does not at this time result in a material impact on CAS covered contracts. Further, should there be a shift due to the type or mix of future business or restructuring, we reserve the right to reopen this issue.

Def.'s Mot. for Judgment on Limitations Defense App. at 67; *see also id.* App. at 83. Accordingly, Ms. Sherwood determined that the revised Disclosure Statement was "both adequate and compliant with the caveat that a *condition that could result in a potentially material CAS 418 noncompliance will be continually monitored and may require redress in the future." Id.* App. at 64. Ms. Sherwood also requested that Sikorsky submit a cost-impact proposal within 60 days. *Id.*

On February 23, 2000, Sikorsky submitted its cost impact proposal to Ms. Sherwood. The proposal reported a net benefit to the government of $2.35 million through 2003. Def.'s Mot. for Judgment on Limitations Defense App. at 98–99. The proposal was revised by Sikorsky on September 15, 2000, with a slightly decreased net benefit to the government of $2.34 million through 2003. *Id.* App. at 115. The documentary record before the court does not indicate what action, if any, Ms. Sherwood took in response to Sikorsky's proposal.

B. *The 2004 Audit and Alleged Agreement*

On June 20, 2001, Mr. Edward Weisman replaced Ms. Sherwood as the government's CACO for Sikorsky. Def.'s Mot. for Judgment on Limitations Defense App. at 155. A little over a year later, on August 22, 2002, DCAA began preparing a second compliance review of Sikorsky's accounting change. Pl.'s Opp'n to Judgment on Limitations Defense Ex. K, at 1. The second audit took an inordinate two years and two months to complete and was finally issued on October 29, 2004. Def.'s Mot. for Judgment on Limitations Defense App. at 132. The audit found that Sikorsky's changed accounting practice was "in potential noncompliance" with CAS 418, *id.* App. at 133, noting that a fully compliant accounting practice could "result[ in an] allocation [to government contracts that] may be materially different," *id.* App. at 139. The audit did not ascertain the materiality of the potential noncompliance because "it would be difficult or nearly impossible for the auditor to determine" certain aspects of Sikorsky's costs. *Id.* App. at 144; *see also id.* App. at 142 (citing *AiResearch Mfg. Co.,* ASBCA No. 20998, 76–2 BCA ¶ 12,-150, 1976 WL 2047, (holding that the ASBCA has jurisdiction over a CAS noncompliance claim, despite the government's omission of a cost-impact estimate, when the contractor's noncompliant accounting is the very reason a cost impact cannot be estimated)).

Sikorsky's response to an earlier draft of the 2004 audit, incorporated into the final 2004 audit, took issue with the government's failure to estimate the materiality of the alleged potential noncompliance. *See* Def.'s Mot. for Judgment on Limitations Defense App. at 153. The response also argued that "[t]he current method ... was approved in 1999. This audit report does not demonstrate any change in business environment from 1999 to 2004 that warrants a change." *Id.* Nevertheless, Sikorsky noted that it was considering a change to its allegedly noncompliant practice as part of a much broader accounting overhaul slated to go into effect on January 1, 2006. *Id.*

From here, the parties' accounts diverge. Sikorsky avers that its representative, Mr. Joseph Chancio, negotiated with Mr. Weis-

man over the course of 2005 to resolve the potential noncompliance. Eventually, according to Sikorsky, the parties made an agreement: Sikorsky would change its accounting practice on January 1, 2006, which change would result in substantial savings to the government, and in exchange, the government would consider the noncompliance issue resolved. *See* Pl.'s Opp'n to Def.'s Mot. for Summary Judgment on the Accord & Satisfaction Defense ("Pl.'s Opp'n to Judgment on Accord Defense") at 3–8. The government differs, averring that, while Mr. Weisman may have approved of Sikorsky's changes going forward, he never waived any past money owed the government for alleged noncompliance. *See* Def.'s Mot. for Summary Judgment upon the Affirmative Defense Based upon Accord & Satisfaction ("Def.'s Mot. for Judgment on Accord Defense") at 9–12. The difficulty in ascertaining what actually happened in 2005 is compounded by the fact that Mr. Weisman died shortly after this suit was filed.

Despite this uncertainty, the available evidence provides some outline of what took place in 2005. Mr. Weisman wrote an e-mail to government personnel on July 20, 2005, stating that he "wanted to sit down with [Mr. Chancio] and clear the air as to what we wanted, so there would be no questions down the road as to our issues.... [W]e need this meeting, so everyone's on the same sheet of music." Pl.'s Opp'n to Judgment on Accord Defense Ex. G. Thereafter, one or more meetings were held involving at least Mr. Chancio and Mr. Weisman. After this meeting or meetings, on August 15, 2005, Mr. Weisman issued a memorandum to file purporting to resolve and dispose of DCAA's noncompliance finding. *See* Pl.'s Opp'n to Judgment on Accord Defense Ex. I, at 1. Mr. Weisman wrote that he "concurs with DCAA's position that [Sikorsky's] current practice ... creates a potential noncompliance with CAS 418." *Id.* Ex. I, at 4. However, he continued, "[w]hile concurring with DCAA's position, the CACO will not require [Sikorsky] to make the recommended changes at this time. In view of the impending implementation of the new [accounting] system, the CACO agrees with Mr. Chancio that it is not cost effective to force these changes into 'legacy' systems which will be shut down in just a few months." *Id.* Ex. I, at 4–5. This determination was communicated in a letter to Sikorsky soon after. *See id.* Ex. J. The letter stated in part:

> [I]n view of the impending implementation of the [new accounting] system in January, 2006, and your agreement to establish a Material Handling rate under the new system, the CACO has determined that it would be neither cost-effective, nor of any substantial benefit to the [g]overnment, to require implementation of the changes recommended by DCAA at this time.

*Id.* Mr. Weisman also filled out forms marking the 2004 audit variously as "closed," "dispositioned," and "resolved." *Id.* Ex. K, at 1, 3; see also id. Ex. M (Dep. of Frank Colandro (March 30, 2011) ("Colandro Dep.")), at 248:21 to 249:8.

Mr. Chancio has averred that Mr. Weisman agreed that the noncompliance issue "would be closed if we made the change [to the 2006 accounting system], and there would be no request for any cost impact determination for the periods of 1999 to 2005." Pl.'s Opp'n to Judgment on Accord Defense Ex. F (Dep. of Joseph Chancio (June 3, 2011) ("Chancio Dep.")), at 81:3–5. Similarly, Sikorsky's former CFO, Mr. Richard Pierpont, has stated that "[i]t was my understanding that the government was not ... going to pursue any damages against Sikorsky for what they alleged was a noncompliance." *Id.* Ex. P (Dep. of Richard Pierpont (April 5, 2011)), at 50:2–4.

Government officials deny these assertions, reciting recollections of statements that constitute hearsay, at least in part. Mr. Frank Colandro, who succeeded Mr. Weisman as the government's CACO for Sikorsky, recounted an alleged conversation that occurred sometime in 2006 or 2007, after he had taken over as CACO. *See* Colandro Dep. at 216:1–5; *cf. id.* at 274:1–8. This conversation, in the presence of Mr. Weisman and Mr. Colandro,

> was precipitated by the fact that I picked up the CAS noncompliance folder [containing materials related to the Sikorsky noncompliance and audit] and I did not see

that it had ... gone through fruition, and there was no determination of materiality, ... there was no cost impact.... And [Mr. Weisman] said I forgot to ask for the cost impact. There was no deal to waive any cost impact.

*Id.* at 215:13–22; *see also id.* at 248:5–7 ("[W]e realized that although the issue was dispositioned, it wasn't closed."); *id.* at 270:11–19 (same). Similarly, Ms. Sherwood, who had preceded Mr. Weisman as CACO, stated that she did not recall Mr. Weisman ever stating that there was a "deal" between the government and Sikorsky. *See* Pl.'s Opp'n to Judgment on Accord Defense Ex. B (Dep. of Joan Sherwood (May 10, 2011)), at 104:6 to 105:14. *Contra* Colandro Dep. at 213:1–21 (Colandro's indication that Sherwood had spoken with Weisman, and that Weisman had told her that "there was a deal," *id.* at 213:10).

Regardless of the alleged agreement's existence and scope, Sikorsky continued with the implementation of its new accounting system. It filed a revised Disclosure Statement on October 31, 2005, effective January 1, 2006. Pl.'s Opp'n to Judgment on Accord Defense Ex. Q., at 2. DCAA issued an audit on February 15, 2006, finding the revised Disclosure Statement adequate and compliant. *Id.* Ex. S at 3. Six days later, Mr. Weisman signed off on the revised Disclosure Statement as adequate and compliant. *Id.* Ex. R. Sikorsky later estimated the cost impact of the 2006 accounting change as involving ten changes benefiting the government for $58 million, and one change, ascribed to the CAS noncompliance issue, resulting in harm to the government of either $19 million or $35 million. *See* Def.'s Mot. for Judgment on Accord Defense App. at 168, 171, 189. It is unknown when or if Sikorsky submitted this cost-impact information to the government. *See id.* App. at 182; *cf.* Pl.'s Opp'n to Judgment on Accord Defense Ex. W, at 3.

### C. *The Government's Claim*

Mr. Colandro succeeded Mr. Weisman as the government's CACO for Sikorsky in June 2006. Pl.'s Opp'n to Judgment on Accord Defense at 7. Mr. Colandro apparently had some knowledge previous to this time of an accounting dispute involving Sikorsky. However, it was not until February 2007 that Mr. Colandro became aware of the 2004 audit finding Sikorsky's practice noncompliant. *See* Def.'s Mot. for Judgment on Limitations Defense App. at 159; *see also* Pl.'s Opp'n to Judgment on Accord Defense Ex. L (e-mail from Boyer to Colandro (Feb. 13, 2007)), at 2 ("[T]he contractor was in potential noncompliance with CAS 418 ... during the period prior to January 1, 2006. Off hand, I do not recall if Ed Weisman ever made a final finding of noncompliance.... I do not know what the impact of the revised accounting practice is on CAS covered contracts.").

Soon thereafter, Mr. Colandro began pursuing a potential claim against Sikorsky. On April 5, 2007, he sent Sikorsky a notice of potential noncompliance, writing that "[a]lthough you ceased following the noncompliant practice at issue ..., the noncompliance was not fully processed in accordance with FAR [§ ] 30.605." Pl.'s Opp'n to Judgment on Accord Defense Ex. T. On May 30, 2007, Sikorsky responded, stating that "since the [2006 accounting] change was implemented as agreed to and the [C]ACO indicated that the matter was closed[,] it is our position that there is no materiality for this cited noncompliance. In conclusion we hope this resolves the noncompliance practice cited in your letter and that a determination of immateriality will be made by your office." *Id.* Ex. U, at 2.

Over a year later, on November 6, 2008, Mr. Colandro issued a final determination pursuant to FAR § 30.605(b)(3)(ii), that Sikorsky's cost accounting practice from 1999 to 2005 was noncompliant. Def.'s Reply to Pl.'s Opp'n to Judgment on the Limitations Defense ("Def.'s Reply re Limitations Defense") App. at 1. The final determination also requested a cost-impact proposal, on or before November 28, 2008, "containing the impact of this noncompliance from January 1, 2003." *Id.* App. at 3. Sikorsky declined to provide a cost-impact proposal. Pl.'s Opp'n to Judgment on Accord Defense Ex. V, at 3. Then, on December 11, 2008, Mr. Colandro issued a final decision determining that Sikorsky's accounting practice was noncompliant from 1999 to 2005, and that the noncompliance became material in 2003. *Id.* Ex. V,

at 4. The decision also asserted a government claim for approximately $80 million. *Id.* Sikorsky filed suit in this court soon thereafter.

### STANDARDS FOR DECISION

The government has moved for summary judgment upon Sikorsky's statute-of-limitations and accord-and-satisfaction defenses. The court will grant summary judgment if the government shows "that there is no genuine dispute as to any material fact and the [government] is entitled to judgment as a matter of law." Rule 56(a) of the Rules of the Court of Federal Claims. A material fact is one "that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute of material fact exists when the finder of fact may reasonably resolve the dispute in favor of either party. *Id.* at 250–51, 106 S.Ct. 2505.

The moving party bears "the initial responsibility of identifying the legal basis of its motion, and of pointing to those portions of the record that it believes demonstrate the absence of a genuine issue of material fact." *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed.Cir.2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Where the nonmovant will bear the burden of persuasion at trial respecting the claim or defense at issue, as is the case here with Sikorsky's affirmative defenses, the movant may meet its summary judgment burden in either of two ways. The movant may either provide "evidence that negates an essential element of the opposing party's case" or show "that the evidence on file (such as pleadings, depositions, and admissions) establishes no material issue of fact and that the opposer will not be able to prove an essential element of its case." *Vivid Techs., Inc. v. American Sci. & Eng'g, Inc.*, 200 F.3d 795, 807 (Fed.Cir.1999) (citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; 2 Robert L. Haig, *Business and Commercial Litigation in Federal Courts* § 25.3(d)(1) (1998)). The nonmovant may defeat summary judgment by coming forward with material facts of its own, more than "[m]ere denials or conclusory statements," indicating "an evidentiary conflict created on

the record." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984). In evaluating the evidence presented, the court draws all reasonable inferences from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

### ANALYSIS

### I.  Sikorsky's Statute–of–Limitations Affirmative Defense

The government's first motion seeks summary judgment on Sikorsky's affirmative defense based upon the statute of limitations. The Contract Disputes Act requires "each claim by the [f]ederal [g]overnment against a contractor relating to a contract [to] be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 7103(a)(4)(A). The parties do not dispute that the government submitted its claim on December 11, 2008, when Mr. Colandro issued his final decision. Thus, the issue is whether the government's claim accrued before December 11, 2002.

"*Accrual of a claim* means the date when all events, that fix the alleged liability of . . . the contractor and permit assertion of the claim, were known or should have been known." FAR § 33.201. The government presents two arguments for why its claim accrued after December 11, 2002. The government's first argument is a legal one: the government contends that the contracting officer had to follow the procedures set out in the parties' contracts, as listed in FAR § 52.230, before the contract would "permit assertion of the claim." Those steps were not completed until November 28, 2008, so the government posits that was the date when the claim accrued. The government's second argument is a factual one: the government contends that it did not have actual or constructive notice of a potential claim until October 29, 2004, when the DCAA reported a potential noncompliance in its second audit.

### A. The Relationship Between Claim Accrual and Administrative Procedures

The government contends that under the terms of its contracts with Sikorsky it could not assert a claim any earlier than November 28, 2008. For this proposition, the government relies on a set of Supreme Court and Court of Claims cases issued between 1878 and 1967. These cases hold, in essence, that contractors must follow the dispute resolution proceedings, if any, set out in their contracts, and that a claim assertable in court does not accrue until those proceedings are completed. *See* Def.'s Reply re Limitations Defense at 9–16 (citing, *e.g.*, *Crown Coat Front Co. v. United States*, 386 U.S. 503, 87 S.Ct. 1177, 18 L.Ed.2d 256 (1967)). The government argues that this doctrine applies here because Sikorsky's contracts include the clauses set out at FAR § 52.230. In the government's view, when the CFAO issued a determination of noncompliance, Sikorsky was required to "[s]ubmit a description of the change necessary to correct a failure to comply with an applicable CAS." FAR § 52.230–6(b)(4). Also, "[w]hen requested by the CFAO, [Sikorsky was obliged to] submit on or before [the] date specified by the CFAO" a cost-impact estimate. FAR § 52.230–6(c); *see* FAR § 52.230–6(d) to (i). Otherwise, the CFAO could issue a final decision. FAR § 52.230–6(j). In this case, the government reasons, "the contracting officer directed Sikorsky to provide a cost-impact calculation by a specified time: November 28, 2008. When Sikorsky failed to meet this deadline, the [g]overnment's right to assert a claim accrued." Def.'s Reply re Limitations Defense at 9 (internal citation omitted).

Sikorsky responds by arguing that the cases cited by the government were superseded by the passage of the CDA in 1978. *See* Pl.'s Surreply to Def.'s Mot. for Summary Judgment on the Statute of Limitations Defense at 4–7. Sikorsky also argues that the contract clauses found at FAR § 52.230 speak only to a contractor's duties under the CAS regime and say nothing about when a claim accrues. *See id.* at 7–8.

### 1. The applicability of Crown Coat and its predecessors.

The government relies on *Crown Coat*, 386 U.S. 503, 87 S.Ct. 1177, for the principle that a claim under a government contract does not accrue until "the completion of the administrative proceedings contemplated and required by the provisions of the contract." *Id.* at 511, 87 S.Ct. 1177. While other recent cases have held that a government CAS claim accrues directly and straightforwardly when the government should have known of its potential claim, none of these cases addressed the government's present argument based on *Crown Coat*. *See Raytheon*, 104 Fed.Cl. at 330–31, 2012 WL 1072294, at *3; *Boeing Co.*, ASBCA No. 57490, 12–1 BCA ¶ 34,916, 2012 WL 176315, at *5; *McDonnell Douglas Servs., Inc.*, ASBCA No. 56568, 10–1 BCA ¶ 34,325, 2009 WL 4774620, at *7–8. The court accordingly will examine whether adoption of the CDA in 1978 vitiated the precedential viability of the *Crown Coat* line of cases in situations where the CDA applies. The parties agree that that case and its progenitors retain vitality in an appropriate situation where the CDA does not apply or is modified by other statutes. *Cf., e.g., Dalton v. Southwest Marine, Inc.*, 120 F.3d 1249, 1252 (Fed.Cir.1997) (two-year statute of limitation in Suits in Admiralty Act, as incorporated by the CDA, tolled during administrative proceedings); *New Valley Corp. v. United States*, 119 F.3d 1576, 1580 (Fed.Cir. 1997) (requiring exhaustion of contract-prescribed remedies in non-CDA suit).

As an initial matter, the contract clauses and the statutory framework in *Crown Coat* were different from those in the present case. The relevant contract clause in *Crown Coat* required the contractor to raise a dispute with its contracting officer. If the contracting officer denied relief, then the contractor had 30 days to appeal the contracting officer's decision to the relevant board of contract appeals. If the board denied relief, then the contractor could bring a claim in district court or the Court of Claims under 28 U.S.C. § 1346,[7] subject to the six-year

---

7. Section 1346(a) provides now, and provided at the time of the *Crown Coat* decision, that federal district courts and this court (or its predecessor) have concurrent jurisdiction over suits for "re-

statute of limitations for claims against the government set out in 28 U.S.C. § 2401(a).[8] The Supreme Court noted that under this scheme, "final administrative action [before the board of contract appeals], which the claimant must await, may occur more than six years after the completion of the contract. When it does, the claimant would be time-barred if the six-year period is measured from the date of final performance." *Crown Coat*, 386 U.S. at 517–18, 87 S.Ct. 1177. Therefore, given this untenable alternative, the Court held that accrual would await the completion of mandatory administrative procedures. *Id.* at 522, 87 S.Ct. 1177.

Tellingly, the Supreme Court in *Crown Coat* differentiated the statutory scheme for claims brought under the Suits in Admiralty Act. That statute "requires actions to be brought within two years after the cause of action arises." *Crown Coat*, 386 U.S. at 516, 87 S.Ct. 1177 (internal quotation marks omitted). And "while suit was permitted only if a claim had been 'disallowed,' the applicable regulations provided that if a claim was not rejected within 60 days after filing, it would be deemed to have been administratively disallowed and the claimant would be free to enforce his claim. *There was no chance for administrative action to consume the entire limitations period and therefore bar all resort to the courts.*" *Id.* at 517, 87 S.Ct. 1177 (emphasis added).

The Contract Disputes Act of 1978 enacted a regime that bears little resemblance to the "hodgepodge of overlapping, confusing, and often conflicting procedures and remedies" at issue in *Crown Coat*. Robert T. Peacock & Peter D. Ting, *Contract Disputes Act Annotated* at i (1998); *see Bromley Contracting Co. v. United States*, 10 Cl.Ct. 668, 671 (1986). First, and most obviously, the CDA, unlike the disputes clause in *Crown Coat*,

contains two statutes of limitations. The first governs administrative timing and requires a claim to be submitted to or by a contracting officer "within 6 years after the accrual of the claim." 41 U.S.C. § 7103(a)(4)(A). The second governs post-claim timing, which requires appeal of a claim to an agency board within 90 days, *id.* § 7104(a), or suit in the Court of Federal Claims within one year, *id.* § 7104(b)(3). It would be most odd to hold that *Crown Coat* applies to the first, six-year limitations period, when the CDA specifically provides a second, 90–day or one-year statute of limitations to file suit after the completion of mandatory administrative proceedings. *Cf. Southwest Marine*, 120 F.3d at 1252 (holding that the two-year statute of limitations for appeals of maritime contracts under the CDA is tolled during administrative proceedings, but not the initial six-year statute of limitations of the CDA). Additionally, similar to the Suits in Admiralty Act as described in *Crown Coat*, the CDA deems a claim denied when the contracting officer fails to act within either 60 days or a reasonable time. 41 U.S.C. § 7103(f)(5). Upon the contracting officer's failure to act, the claim can be asserted in court, thus precluding the possibility of "administrative action . . . consum[ing] the entire limitations period." *Crown Coat*, 386 U.S. at 517, 87 S.Ct. 1177; *see Bromley*, 10 Cl.Ct. at 670 (The CDA "brought a provident change to the resolution of government contract disputes" by giving the contractor "the option of direct access to the United States Claims Court rather than appealing the contracting officer's decision to the agency's contract appeals board.").

The rationale behind *Crown Coat* was superseded by the CDA for a second reason: the CDA gives the government complete control over when it may assert a claim. The

---

covery of any internal-revenue tax" and "[a]ny other civil action or claim against the United States, not exceeding $10,000 in amount, founded . . . upon any express or implied contract with the United States."

8. Section 2401 likewise provides now, as it did at the time of *Crown Coat*, that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."

Section 2401 applies to civil suits against the United States in district courts, while 28 U.S.C. § 2501 sets a comparable six-year statute of limitations for suits in this court, unless a more specific statute prescribes a different limitations period.

Notably, in its current form, Section 2401 applies "[e]xcept as provided by chapter 71 of title 41," which recodifies the Contract Disputes Act.

government, just like a contractor, is not required to wait on a board of contract appeals. *See* 41 U.S.C. § 7103(a)(3), (a)(4)(A). And while the government may have its own internal review procedures that it must follow prior to submitting a claim, nothing in the CDA mandates such procedures, nor can such procedures delay accrual of a claim. *See United States v. Commodities Export Co.*, 972 F.2d 1266, 1271 (Fed.Cir.1992).[9]

2. *Claim accrual and the CAS regulations.*

Even if *Crown Coat* were to apply to this case, which it does not, there is nothing in the contracts between Sikorsky and the government that would delay the accrual of the government's claim. The government's CAS claim depends on the contract clauses of FAR § 52.230. Under certain circumstances, "[w]here the parties ha[ve] agreed in advance to a condition on the filing of a suit, the ... [c]ourt [will give] effect to that agreement by delaying accrual of the right of action." *Commodities Export*, 972 F.2d at 1271. "In this case, however, the parties have not agreed to conditions on institution of a suit" that would delay accrual. *Id.*

The government first points to certain contract provisions found at FAR § 52.230–2. These provisions state:

(a) [T]he [c]ontractor, in connection with this contract, shall—....

(5) Agree to an adjustment of the contract price or cost allowance, as appropriate, if the [c]ontractor ... fails to comply with an applicable Cost Accounting Standard ... and such failure results in any increased costs paid by the United States.

(a) If the parties fail to agree whether the [c]ontractor ... has complied with an applicable CAS ... and as to any cost adjustment demanded by the United States, such failure to agree will constitute a dispute under the Contract Disputes Act.

FAR § 52.230–2(a), (a)(5), (b). The government contends that FAR § 52.230–2(a)(5) requires the contractor and the United States to "negotiate" an adjustment according to the procedures set out in FAR § 52.230–6, and that a claim only accrues "if the parties [still] fail to agree" after those steps are taken. *See* Def.'s Reply re Limitations Defense at 7–8 (quoting FAR 52.230–2(b)).

The government misconstrues these provisions. They do not address when a claim

---

9. In effect, the CDA restricted the government's options on dispute resolution. As the Federal Circuit observed in *Seaboard Lumber Co. v. United States*, 903 F.2d 1560 (Fed.Cir.1990):

> After the *Wunderlich* decision [*United States v. Wunderlich*, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951)], Congress, as a matter of grace, provided for narrow judicial review of a contracting officer's decision, limiting by statute (the Wunderlich Act) the contractual options previously available to the government. *See* 41 U.S.C. §§ 321, 322 (1982).... However, absent a contractor's invoking the allowed procedures, a contracting officer's decision became the final adjudication of the government's claim by reason of the disputes clause in the contract. *Crown Coat* [, 386 U.S. at 512–14, 87 S.Ct. 1177.].
>
> The CDA, which followed the Wunderlich Act, *further restricted the government's options on dispute resolution. Congress mandated that the government had to include in its contracts the broader review provisions set out in the CDA, that is, the dual avenues of review either by appeal to a Board of Contract Appeals or by a direct access suit in the Court of Claims.* However, Congress confirmed the use of a finality clause in the contract with respect to a contracting officer's decision in favor of the

government, absent the contractor's resort to these review procedures. *See* 41 U.S.C. § 605. Otherwise, the government is not required to litigate the merits of its breach claim.

*Id.* at 1565 (emphasis added). Among other things, the provisions of the CDA providing jurisdictional access to boards of contract appeals and to this court cannot be waived. *See Minesen Co. v. McHugh*, 671 F.3d 1332, 1337–41 (Fed.Cir. 2012) (enforcing a contractual clause that provided for review of a contracting officer's decision by a board of contract appeals and also specified the finality of the board's decision, thus barring an appeal of the board's decision to the Federal Circuit, but commenting that in the CDA "Congress ensured immutable access to the United States Court of Federal Claims"); *id.* at 1349 (Bryson, J. dissenting) ("Although the contractual provision at issue in this case purports to displace the provisions of the CDA altogether, it cannot have the effect of foreclosing a direct appeal to the Court of Federal Claims, because 41 U.S.C. § 7104(b)(1) provides that such an appeal can be brought 'notwithstanding any contract provision ... to the contrary.'" (alteration in original) (citing *Seaboard Lumber*, 903 F.2d at 1565)).

accrues. They do not require negotiation before a claim could arise. They only confirm that a failure to agree is a dispute that falls within the ambit of the CDA. As such, the provisions make plain the two alternatives available when a noncompliance occurs: if the contractor agrees with the resulting adjustment, it must pay; if the contractor does not agree, it must defend against a claim.

■ Turning to the more detailed provisions set out in FAR § 52.230–6, these do not constitute a set of conditions that must be satisfied prior to filing suit. The government cites certain contract clauses that instruct the parties of actions they may or must take under particular circumstances. *See* Def.'s Reply re Limitations Defense at 8–9 (citing FAR § 52.230–6(b)(4) ("[The contractor must s]ubmit a description of the change necessary to correct a failure to comply with an applicable CAS."); FAR § 52.230–6(c) ("When requested by the CFAO, [the contractor shall] submit on or before a date specified by the CFAO" a cost-impact proposal.); FAR § 52.230–6(j), (j)(2) ("If the [c]ontractor does not submit [a description of a correcting change or a cost-impact proposal, as applicable,] within the specified time . . ., the CFAO may . . . [i]ssue a final decision.")). These provisions, however, whether viewed together or in isolation, do not comprise the kind of coherent claims resolution process contemplated by the contract clauses examined in *Crown Coat* and its predecessors. *Compare* FAR § 52.230–6, *with Crown Coat*, 386 U.S. at 505, 87 S.Ct. 1177, *United States v. Joseph A. Holpuch Co.*, 328 U.S. 234, 236, 238, 66 S.Ct. 1000, 90 L.Ed. 1192 (1946), *and Nager Elec. Co. v. United States*, 368 F.2d 847, 858–59 (Ct.Cl.1966). The contract clauses alone, for example, do not explain when or how the CFAO should issue a determination of noncompliance, *see* FAR § 52.230–6(b)(4), when or under what circumstances the CFAO should request a cost-impact proposal, *see* FAR § 52.230–6(c), or what the CFAO

should do if the contractor *does* submit a cost impact showing a loss to the government. Implicitly, a coherent whole could be derived from these contractual provisions—but only by reference to the machinery at FAR Part 30. Nonetheless, an agency's self-imposed, internal regulations are invisible for claim accrual purposes because they are not part of the contract. *See Commodities Export*, 972 F.2d at 1271. Thus, the clauses at FAR § 52.230, viewed *in vacuo* as they must be, do not serve as a set of preconditions to filing suit that would serve to delay the statute of limitations.

Furthermore, a delayed accrual rule would be incompatible with the intended functioning of CAS administration. *See United States v. Memphis Cotton Oil Co.*, 288 U.S. 62, 69, 53 S.Ct. 278, 77 L.Ed. 619 (1933) (Accrual of a cause of action "must keep in view the realities of administrative practice, for its effect will be to regulate the conduct of administrative officers."). FAR § 52.230–6(b)(4) requires a contractor to submit changes to correct a CAS noncompliance within 60 days of receiving a determination of noncompliance. Likewise, FAR § 52.230–6(c) requires a contractor, if asked, to submit an estimate of the cost impact of a noncompliance within a time set by the CFAO. If the contractor fails to do either within the appropriate time, then FAR § 52.230–6(j) permits the government's contracting officer to issue a final decision. If a government claim were to accrue only at this point, then the CFAO could delay the statute of limitations indefinitely simply by refraining from issuing a determination of noncompliance or from requesting a cost impact. "This court cannot, however, permit a single party to postpone unilaterally and indefinitely the running of the statute of limitations." *Commodities Export*, 972 F.2d at 1271; *see also Raytheon*, 104 Fed.Cl. at 330 n. 4, 2012 WL 1072294, at *3 n. 4 ("Contracting parties cannot establish a statute of limitations longer than that set forth in the Contract Disputes Act.") (citing FAR § 33.206(b)).[10]

---

**10.** Delayed accrual would similarly frustrate the internal agency procedures set out in FAR Part 30. If the CFAO finds a material noncompliance, he or she must "[r]equest that the contractor submit by a specified date" a cost-impact proposal. FAR § 30.605(c)(2)(i)(B). Only after

the time for submission expires, taking into account any extensions of time that may be granted, may the CFAO assert a claim. FAR §§ 30.604(i), .605(i), .606(c)(6)(ii). If a government claim did not accrue until that deadline passed, then the contracting officer could delay

## B. The Accrual Date of the Government's Claim

The CDA's statute of limitations reflects the general rule that "a cause of action accrues when all events necessary to state a claim have occurred." *Chevron U.S.A., Inc. v. United States*, 923 F.2d 830, 834 (Fed.Cir. 1991) (citing *Kinsey v. United States*, 852 F.2d 556, 557 (Fed.Cir.1988)). Thus, a government claim accrues under the CDA, as defined in the FAR, "when all events, that fix the alleged liability of . . . the contractor and permit assertion of the claim, were known or should have been known." FAR § 33.201.

"To determine when liability is fixed, we start by examining the legal basis of the particular claim." *Gray Personnel, Inc.*, ASBCA No. 54652, 06–2 BCA ¶ 33,378, 2006 WL 2390292, at *8; *see also, e.g., Franconia Assocs. v. United States*, 536 U.S. 129, 141, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002) (applying "applicable principles of general contract law" to determine when a government's claim for breach of contract accrued (internal quotation marks omitted)). Here, the legal

basis for the government's claim is Sikorsky's alleged noncompliance with CAS 418. For a CAS 418 noncompliance claim to accrue, two conditions must be met. First, there must be a violation of CAS 418, which requires both that an indirect cost pool of a contractor contain costs that "do not have the same or a similar beneficial or causal relationship to cost objectives" and that, "if the costs were allocated separately, the resulting allocation would be materially different." FAR § 9904.418–50(b)(2); *see Sikorsky*, 102 Fed.Cl. at 59–60.[11] Second, the government must have actual or constructive notice of the CAS 418 violation.

The parties agree that the government asserted its claim in this case when the contracting officer, Mr. Colandro, issued his final decision demanding payment on December 11, 2008. Thus, for the government to succeed on summary judgment, it must show that the government did not know, and should not have known, of its claim any earlier than December 11, 2002. Put in oth-

---

accrual virtually indefinitely, simply by specifying a long-off date for submission or granting continuing extensions of time.

**11.** This second prong of FAR § 9904.418–50(b)(2), which provides that a contractor remains in compliance with CAS 418 if "the resulting allocation [under a potentially noncompliant practice is not] materially different," bears strong similarity to the CAS administration procedures found at FAR § 30.605(b)(4). The provision in FAR Part 30 states that, if a CFAO finds that a CAS violation is immaterial, the CFAO shall inform the contractor that "[t]he noncompliance should be corrected; and . . . [i]f the noncompliance is not corrected, the [g]overnment reserves the right to make appropriate contract adjustments should the noncompliance become material in the future." FAR § 30.605(b)(4)(i)(A)–(B). The provision also states that the CFAO should "[c]onclude the cost-impact process with no contract adjustments." FAR § 30.605(b)(4)(ii). For both FAR § 9904.418–50 and FAR § 30.605, materiality is defined according to the definition found at FAR § 9903.305. FAR § 30.602(a); *see* FAR § 9904.418–30(a); *Sikorsky*, 102 Fed.Cl. at 53.

As a technical matter, these provisions differ in that a contractor does not violate CAS 418—even "facial[ly]," as Sikorsky has termed it, *see* Hr'g Tr. 64:18 to 65:17 (June 18, 2012)—if the contractor's practices do not result in a materially different allocation of costs to CAS-covered contracts. In such a situation, it is incorrect to say

that there is an immaterial noncompliance per FAR § 30.605(b)(4). Rather, the practice is still compliant under FAR § 9904.418–50(b)(2).

Regarding claim accrual, however, there is no practical difference. The determination under FAR § 9904.418–50(b)(2)—whether "the resulting allocation [is] materially different"—functions in effect as a specific instance of the CFAO's determination under FAR § 30.605(b)(4) of whether a CAS practice's cost impact is material. Under both regulatory provisions, the CAS noncompliance claim accrues when the government knows or should know that the contractor's CAS practices are otherwise noncompliant *and* are materially affecting CAS-covered contracts. Correlatively, claim accrual does not depend on when, or if, the magnitude of the materiality is ever actually determined. *See Raytheon*, 104 Fed.Cl. at 330–31, 2012 WL 1072294, at *3; *McDonnell Douglas*, 2009 WL 4774620, at *8 ("When monetary damages are alleged, some *extra costs must have been* incurred before liability can be fixed and a claim accrued, but there is no requirement that a sum certain be established." (citing *Gray Personnel*, 2006 WL 2390292)); *cf. CACI Int'l, Inc.*, ASBCA No. 57559, 12–1 BCA ¶ 35,027, 2012 WL 1579541, at *7 ("As early as the late 1970's, we held that we have jurisdiction to decide whether a contractor has violated CAS even though the government has not made a determination of the cost impact of the alleged violations or demanded any cost adjustments." (citing *AiResearch Mfg. Co.*, 76–2 BCA ¶ 12,150, at 58,447, 1976 WL 2047)).

er terms, the question is this: when did the relevant government officials know, or when should they have known, that in their view Sikorsky's accounting practices were materially noncompliant?

■ Whether events have occurred to fix a party's liability "is determined under an objective standard; a [claimant] does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue." *Fallini v. United States,* 56 F.3d 1378, 1380 (Fed.Cir.1995) (citing *Menominee Tribe v. United States,* 726 F.2d 718, 721 (Fed.Cir.1984)). The question of when a claimant should know of its claim is a factbound inquiry that depends on the reasonableness of the claimant's actions. *See Holmes v. United States,* 657 F.3d 1303, 1320 (Fed.Cir.2011) (citing *Ingrum v. United States,* 560 F.3d 1311, 1315–16 & n. 1 (Fed. Cir.2009); *L.S.S. Leasing Corp. v. United States,* 695 F.2d 1359, 1366 (Fed.Cir.1982) (holding that a claim is suspended if "inherently unknowable" under a reasonableness standard)).

■ Here, there is a genuine factual dispute as to when the government was on notice of Sikorsky's alleged CAS violation, including the necessary element that the CAS noncompliance was material. Evidence in the record indicates that Ms. Sherwood, the CACO until June 25, 2001, may have been aware that Sikorsky's revised accounting practice would result in a material cost impact on CAS-covered contracts.[12] In particular, there is evidence of a meeting held on February 4, 1999, the subject of which was "[c]ost [i]mpact of 8/10/98 [accounting] [c]hange and [a]udit." Pl.'s Opp'n to Judgment on Limitations Defense Ex. E, at 1. At that meeting, DCAA auditor Boyer allegedly advised Ms. Sherwood that Sikorsky's accounting change would result in a cost impact of a number of millions of dollars in future years. *See id.* Ex. E, at 3. Similarly, on a

draft of the 1999 audit, Mr. Boyer suggested eliminating the draft's cost-impact estimates, writing in the margin that "cost impact figures other than these were disclosed to [CACO]." *Id.* Ex. F, at 7.

Beyond what Ms. Sherwood may have actually known, a factual question exists regarding what Ms. Sherwood and Mr. Weisman, her replacement as CACO, reasonably should have known. *See Holmes,* 657 F.3d at 1320. First, in light of the estimates shown to Ms. Sherwood by Mr. Boyer, there is a factual question as to whether it was reasonable for Ms. Sherwood to have found that Sikorsky's accounting practice was compliant. This is especially so given that the finding of compliance in the 1999 audit was "primarily based on the fact that there is no material impact on CAS[-]covered contracts *for [calendar year ] 1999,*" but not future years. Def.'s Mot. for Judgment on Limitations Defense App. at 67 (emphasis added). Second, there is a factual question as to whether Ms. Sherwood or Mr. Weisman should have inquired further or more vigilantly monitored the unfolding results, given the information at hand. On the one hand, Ms. Sherwood, after receiving the 1999 audit, requested a cost-impact proposal from Sikorsky. *Id.* App. at 64. Sikorsky's response, issued February 23, 2000 and revised September 15, 2000, indicated a net benefit to the government of about $2.3 million dollars. *Id.* App. at 98–99, 115. These representations would seem to belie any government notice of a potential claim. On the other hand, the 1999 audit reported that Sikorsky's current compliance could change, depending in part on future production of military helicopters and a potential restructuring of operations by Sikorsky. Def.'s Mot. for Judgment on Limitations Defense App. at 67 ("[S]hould there be a shift due to the type or mix of future business or restructuring, we reserve the right to reopen this issue.") (quoted more

12. The parties strenuously dispute *who* in the government must have notice of a claim for it to accrue. The government contends that, for a CAS noncompliance claim to accrue, the contracting officer must have notice. *See* Def.'s Reply re Limitations Defense at 23–26. Sikorsky contends that accrual may occur when other responsible actors, purportedly including DCAA auditors, know of the claim. *See* Pl.'s Opp'n to Judgment on Limitations Defense at 4–6. At this early juncture it is unnecessary to decide the question. Regardless of the knowledge of other actors, there is a material dispute as to whether either of the contracting officers, namely Ms. Sherwood and Mr. Weisman, had knowledge of the claim prior to December 11, 2002.

fully *supra*, at 664); *see also id.* App. at 83. It remains unresolved whether this report should have reasonably caused Ms. Sherwood or Mr. Weisman to inquire further. It also remains unresolved whether and when Ms. Sherwood or Mr. Weisman reasonably should have reopened the issue based on changes to Sikorsky's helicopter production or Sikorsky's restructuring plans. In short, genuine disputes of material fact exist related to the accrual of the government's claim. The government's motion to dismiss Sikorsky's affirmative defense based upon the statute of limitations must be denied.

## II. Sikorsky's Accord–and–Satisfaction Affirmative Defense

The government's second motion seeks to dismiss Sikorsky's accord-and-satisfaction affirmative defense. Sikorsky alleges that in late 2005, in response to the 2004 audit showing a potential noncompliance, it made an agreement with the government. As Sikorsky would have it, Mr. Weisman, the then-CACO, and Mr. Chancio, Sikorsky's representative, agreed to consider the noncompliance issue resolved in exchange for Sikorsky's decision to change its accounting practice going forward, which change would result in an alleged net benefit to the government of $95 to $100 million. *See* Pl.'s Opp'n to Judgment on Accord Defense at 9. The government contends that no accord and satisfaction occurred because the noncompliance issue allegedly was never expressly addressed.

### A. *The Legal Framework*

■■■■ "A claim is discharged by the doctrine of accord and satisfaction when 'some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim.'" *O'Connor v. United States*, 308 F.3d 1233, 1240 (Fed.Cir.2002) (quoting *Case, Inc. v. United States*, 88 F.3d 1004, 1011 n. 7 (Fed.Cir. 1996)). "In its most common form, an accord and satisfaction exists as 'a mutual agreement between the parties in which one pays or performs and the other accepts payment or performance in satisfaction of a claim or demand which is a bona fide dispute.'" *Id.* (quoting *Nevada Half Moon Mining Co. v.*

*Combined Metals Reduction Co.*, 176 F.2d 73, 76 (10th Cir.1949)). An effective accord and satisfaction requires four elements: "(1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration." *Holland v. United States*, 621 F.3d 1366, 1382 (Fed.Cir. 2010) (quoting *O'Connor*, 308 F.3d at 1240). *See generally* Restatement (Second) of Contracts § 281 (1981).

■■■■ In this case, the parties dispute only whether there was a meeting of the minds between Mr. Weisman and Mr. Chancio. Whether there was such a meeting of the minds is determined by an examination of "the totality of the factual circumstances." *Texas Instruments Inc. v. United States*, 922 F.2d 810, 815 (Fed.Cir.1990). In particular, "[t]here must be accompanying expressions sufficient to make the creditor understand or to make it unreasonable for him not to understand, that the performance is offered to him as a full satisfaction of th[e] claim and not otherwise." *Thomas Creek Lumber & Log Co. v. United States*, 36 Fed.Cl. 220, 243 (1996) (quoting *Chesapeake & Potomac Tel. Co. v. United States*, 654 F.2d 711, 716 (Ct. Cl.1981) (in turn quoting 6 Arthur L. Corbin, *Corbin on Contracts* § 1277 (1962))); *see also Robinson Contracting Co. v. United States*, 16 Cl.Ct. 676, 681 (1989) (a meeting of the minds occurs when "[t]he necessary clarity and understanding for a contractual agreement [is] evident."), *aff'd*, 895 F.2d 1420 (Fed.Cir.1990) (unpublished table decision).

### B. *Meeting of the Minds*

The government argues that there was no meeting of the minds. According to the government, Mr. Weisman could not have waived any money owed for the noncompliance because that issue was never addressed by the parties. Factually, the government asserts that "[Sikorsky] admits that the cost impact for the material overhead accounting change was *never discussed* with the contracting officer when the purported 'deal' was reached. No oral agreement is reached [on a] topic when the topic is *never mentioned*." Def.'s Mot. for Judgment on Accord Defense at 2. The government also points to the regulations at FAR Part 30, which instruct

the contracting officer to refrain from acting further on a contractor's potential noncompliance only if he finds the noncompliance immaterial. *See id.* at 14–15 (citing FAR § 30.602(b)(2), (c)(2); FAR § 30.605(b)(3)). Mr. Weisman never made such a finding, the government argues, which further establishes that there was no agreement resolving monies owed for the potential noncompliance. *See id.*

Sikorsky contends that the evidentiary record contradicts the government's assertions. According to Sikorsky, the record shows that Mr. Weisman reached an agreement with Mr. Chancio, and the parties' subsequent statements and conduct confirmed that they considered the CAS noncompliance issue resolved and closed. *See* Pl.'s Opp'n to Judgment on Accord Defense at 12–14.

### 1. *Evidence purportedly negating a meeting of the minds.*

The government first argues that Sikorsky's agents affirmatively testified that there was no express agreement between Sikorsky and the government to waive the cost impact of the noncompliance. If the government were correct, then the government would be entitled to summary judgment on ground that it had submitted "evidence that negates an essential element of the opposing party's [affirmative defense]." *Vivid Techs.*, 200 F.3d at 807. The government cites the following deposition testimony of Mr. Chancio in support of its motion:

> Q. ... [D]id you have any specific conversation with Mr. Weisman about the cost impact calculation for the material overhead change?
>
> A. No. What I told Mr. Weisman ... was that we would include it in the accounting change and that we planned to submit a cost impact proposal for the entire accounting change.
>
> I don't recall breaking that piece out in any conversations because, again, it would be inherent that when we agreed to put it in the accounting change, that it would become part of it, of which we were required to submit the cost impact proposal.

> But I do not recall specifically talking to [Mr. Weisman] ... about just a cost impact for that change.

Def.'s Mot. for Judgment on Accord Defense at 11 (Def.'s emphasis removed) (quoting *id.* App. at 203–04 (Chancio Dep. at 38:25 to 39:17)). The government also points to evidence purporting to show that Sikorsky calculated a noncompliance cost impact *after* the meetings with Mr. Weisman, further demonstrating that Sikorsky did not believe the cost-impact issue was resolved. *See id.* at 9–10, 14.

In making its argument, the government has conflated two different cost-impact calculations required under the FAR. As Sikorsky correctly points out, there is a difference between a cost-impact proposal required to redress a CAS noncompliance and a cost-impact proposal required for an accounting change, such as the one Sikorsky made in 2006. Pl.'s Opp'n to Judgment on Accord Defense at 14–15. As discussed *supra* at 661–63, a cost-impact proposal for an alleged CAS noncompliance estimates the increased or decreased costs to the government due to that noncompliance. *See* FAR § 30.605(c)(2)(i)(B), (d)(4). In contrast, a cost impact for an accounting change measures the change in costs to CAS-covered contracts due to the accounting change. *See* FAR § 30.604(b)(1)(i), (d)(1). These are two separate estimates. *See* FAR § 30.601(a)(2) ("If a *change* in cost accounting practice *or noncompliance* has occurred, [the CFAO shall determine] how any resulting cost impacts are resolved." (emphases added)); FAR § 30.606(a)(3) (differentiating between the cost impacts of noncompliances and various kinds of changes).

The government's proffered evidence refers to the anticipated cost impact of Sikorsky's 2006 accounting overhaul, not the past cost impact of its 1999–to–2006 alleged noncompliance. This becomes evident when Mr. Chancio's cited testimony is examined in context:

> Q. ... [D]id you have any understanding of what the cost impact *for a change from a noncompliant practice to a compliant practice* with regard to material overhead costs would be?

A. Well, first of all, we thought both practices were compliant, but we were looking [to make] the change to establish a material overhead rate, if we could resolve the alleged noncompliance, that *it would become part of our 2006 voluntary accounting change.*

So, *as part of that package* of which ... establishment of material overhead rate was one of several changes, we looked at it from a point of view that it was a voluntary change....

*As far as the noncompliance,* I don't recall. We may have done some casual looks at it....

Q. And do you recall the year that the cost impact calculation [was made] for the change in practice for allocating material overhead costs from 1999–2005 to the practice of 2006? ...

A. ... We had planned to put it in as a voluntary change because, in our mind ... [the] alleged noncompliance issue was closed, was completed....

So, I had promised Mr. Weisman, as part of the arrangement in the agreement, ... that ... *we would make the change 1–1–06 and include it as a voluntary change, going forward. So, we calculated it.* ...

Q. And, so, you believe that you told Mr. Weisman in 2005 that you would include a cost impact for the change in material overhead practices, but that the calculation would be made as a voluntary change?

A. Yes....

Q. And you recall today specifically talking to Mr. Weisman about the cost impact calculation? ...

A. ... What I specifically recall is that we told him *we would include it in our 2006 accounting change submission. Therefore, by default, it would have to be part of the cost impact proposal* ....

Q. Okay. And I understand the logic of that statement, Mr. Chancio, but my question is a little different and, that is, did you have any specific conversation with Mr. Weisman about the cost impact calculation for the material overhead change?

A. No. What I told Mr. Weisman ... was that we would include it in the accounting change and that we planned to submit a cost impact proposal for the entire accounting change.

Def.'s Mot. for Judgment on Accord Defense App. at 196–204 (Chancio Dep. at 31:12 to 32:7, 35:9 to 36:18, 37:14 to 39:8) (emphases added). Likewise, in accord with this testimony, Sikorsky's actions in calculating a cost impact were done as part of the 2006 accounting change, not as a measure of the costs of the alleged noncompliance from 1999 to 2005. *See id.* App. at 168 (Letter from Sikorsky to Weisman (Mar. 28, 2006)) ("[Sikorsky's] CASB Disclosure Statement with an effective date of January 1, 2006 was approved on February 21, 2006. Attached you will find our General Dollar Magnitude [cost-impact statement] associated with the accounting changes. *This ... proposal compares contract cost under Sikorsky['s] ... accounting practices effective 1/1/2006 and pre 1/1/2006.*" (emphasis added)); *see also id.* App. at 166 (Letter from Sikorsky to Weisman (Nov. 1, 2005)) ("The General Dollar [M]agnitude ... will be submitted in accordance with *FAR [§ ] 30.604.*" (emphasis added)).

The government also points to a letter dated September 2, 2005 from Mr. Weisman to Sikorsky as evidence negating an accord and satisfaction. According to the government, Mr. Weisman's letter did not make a finding that Sikorsky's alleged noncompliance resulted in no material cost impact, as would occur when resolving an immaterial cost impact under the applicable regulations. *See* Def.'s Mot. for Judgment on Accord Defense at 14–15.[13]

■ These arguments may be irrelevant. Notably, a determination of the materiality of a noncompliance is part of the CAS administration procedures, FAR

---

13. Those regulations include FAR § 30.602(b)-(b)(2) ("A CFAO determination of materiality ... [m]ay be made before or after a general dollar magnitude proposal has been submitted ... [and s]hall be based on adequate documentation.") and FAR § 30.605(b)(4) ("If the CFAO makes a determination of noncompliance, the CFAO shall follow [additional procedures] unless the CFAO also determines the cost impact is immaterial."). *See supra,* at 662.

§ 30.605(b)(3)(ii), but both parties agree that such a determination is unnecessary for an effective accord and satisfaction. Hr'g Tr. 79:15–16, 85:25 to 86:6 (Mr. Poirier); 81:16–21 (Mr. Hall) (June 15, 2012). The court concurs. While "an agent of the [g]overnment may not bind the [g]overnment to an agreement when such an act is directly forbidden by U.S. law or regulations," *Texas Instruments*, 922 F.2d at 815 (citing *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947)), "[c]ourts have consistently afforded a wide degree of latitude to contracting officers in their 'authority to enter into, administer, or terminate contracts,'" *Thomas Creek Lumber*, 36 Fed.Cl. at 238 (quoting *NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 377 (Fed.Cir.1986)). That authority stems from the government's policy to "try to resolve all contractual issues in controversy by mutual agreement at the contracting officer's level" and to make "[r]easonable efforts ... to resolve controversies prior to the submission of a claim." FAR § 33.204. Thus, "contracting officers are authorized, within any specific limitations of their warrants, to decide or resolve all claims arising under or relating to a contract." FAR § 33.210; *see also* FAR § 1.602–1; FAR § 2.101 (defining "contracting officer"); *cf., e.g., Compliance Corp. v. United States*, 22 Cl.Ct. 193, 201 (1990) (upholding a contracting officer's decision to disqualify a bidder even though not expressly authorized by any statute or regulation because the action was "inherent in his duty to 'safeguard[ ] the interests of the United States in its contractual relationships'" (alteration in original) (quoting *NKF Eng'g*, 805 F.2d at 377 (in turn quoting FAR § 1.602–2 (1985)))). This wide authority includes the power to enter into an accord and satisfaction related to a CAS-covered contract without making a formal cost-impact determination. Thus, the fact that Mr. Weisman's letter dated September 2, 2005 does not discuss a cost impact is no bar to an alleged accord and satisfaction.

2. *A purported lack of evidence to support a meeting of the minds.*

The government argues in the alternative that, even if there is no evidence specifically negating a meeting of the minds, the evidence on file does establish that there is a "lack of proof of a material fact," *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505, demonstrating that Sikorsky "will not be able to prove an essential element of its [affirmative defense]," *Vivid Techs.*, 200 F.3d at 807. The government's argument essentially is that Mr. Weisman could not enter into an accord and satisfaction without explicitly addressing the cost impact of the potential noncompliance, and there is no evidence that Mr. Weisman did so. *See, e.g.*, Hr'g Tr. 78:3–4 (Mr. Poirier) (June 15, 2012) (stating that Mr. Weisman would need to say something akin to "we won't charge you any damages for your noncompliance" to effect an oral agreement).

At the outset, there *is* evidence in the record that Mr. Weisman and Mr. Chancio expressly agreed to waive money owed for the past noncompliance. Mr. Chancio testified that Mr. Weisman agreed that the noncompliance issue "would be closed if we made the change [to the 2006 accounting system], and there would be no request for any cost impact determination for the periods of 1999 to 2005." Pl.'s Opp'n to Judgment on Accord Defense Ex. F (Chancio Dep.) at 81:3–5; *see also id.* Ex. F (Chancio Dep.), at 81:9–13 (Q. "And Mr. Weisman specifically told you 'There will be no requests for a cost impact for the period January 1999 through September of 2005'?" A. "Yes. .... He said, 'If you make the change going forward, I will close the noncompliance out.'"). Likewise, Mr. Colandro, who succeeded Mr. Weisman as CACO, testified that Mr. Weisman told the previous CACO, Ms. Sherwood, that "there was a deal." Colandro Dep. at 213:10. *But see id.* at 215:20–22 ("[Mr. Weisman] said I forgot to ask for the cost impact. There was no deal to waive any cost impact.").

Likewise, the parties' subsequent conduct may be understood, when viewed in the light most favorable to Sikorsky, as evincing an earlier express agreement to waive cost impact. Mr. Weisman's letter to Mr. Chancio dated September 2, 2005 may be interpreted as memorializing an earlier express agreement to forgo the money owed for any past noncompliance. *See Texas Instruments*, 922

F.2d at 813 ("[W]hen an authorized contracting officer expresses a definite opinion concerning the merits of a claim with knowledge of the relevant facts, a 'decision' has been made." (quoting *General Elec. Co. v. United States*, 412 F.2d 1215, 1221 (Ct.Cl.1969))). The letter states in relevant part:

> [I]n view of the impending implementation of the [new accounting system] in January, 2006, and *your agreement* to establish a Material Handling rate under the new system, the CACO has determined that it would be *neither cost-effective, nor of any substantial benefit to the [g]overnment*, to require implementation of the changes recommended by DCAA [in the 2004 audit] at this time.

Def.'s Mot. for Judgment on Accord Defense App. at 164 (emphases added). Likewise, Mr. Weisman's decision to close out the 2004 audit constitutes circumstantial evidence of an express agreement to waive any money potentially owed. In particular, Mr. Weisman's actions in marking the database for the 2004 audit not only as "dispositioned," but also as *"closed"* and *"resolved,"* Pl.'s Opp'n to Judgment on Accord Defense Ex. K, at 1, 3 (emphases added), is potentially a strong expression of Mr. Weisman's state of mind at the time of the negotiations.

■■■ Further, even if Mr. Chancio and Mr. Weisman failed to explicitly agree in so many words, that would not be dispositive. The formation of an accord and satisfaction does not require an incantation. Rather, there need only be expressions "sufficient to make the creditor understand, or to make it unreasonable for him not to understand, that the performance is offered to him as a full satisfaction of his claim and not otherwise."

*Chesapeake & Potomac Tel.*, 654 F.2d at 716; see *Kanag'Iq Constr. Co. v. United States*, 51 Fed.Cl. 38, 47 (2001) ("[T]he absence of an express provision regarding discharge does not preclude the finding of an accord." (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 n. 4 (Fed.Cir.1987))); *cf. Dureiko v. United States*, 209 F.3d 1345, 1356 (Fed.Cir.2000) ("If [a] release is ambiguous as to its scope of coverage, we construe its language to effect the parties' intent at the time they executed the release." (citing *King v. Department of the Navy*, 130 F.3d 1031, 1033 (Fed.Cir.1997))). *See generally* 13 Arthur L. Corbin et al., *Corbin on Contracts* § 70.2 n. 1 (rev. ed. 2012).[14] At this stage of the litigation, there is a genuine dispute as to the parties' understanding of the purported agreement between Mr. Chancio and Mr. Weisman. The existence, terms, and scope of any accord and satisfaction entered by them remains a question of fact, and resolution of these matters will require trial.

## CONCLUSION

For the reasons stated, the government's Motion for Summary Judgment upon the Affirmative Defense Based upon the Statute of Limitations is DENIED. Similarly, the government's Motion for Summary Judgment upon the Affirmative Defense Based upon Accord and Satisfaction is DENIED.[15]

It is so ORDERED.

---

14. This doctrine is not to be confused with the elements of an implied-in-fact contract. "An implied-in-fact contract requires a 'meeting of the minds, which although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding.' " *Bank of Guam v. United States*, 578 F.3d 1318, 1329 (Fed.Cir.2009) (quoting *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir.1997)). There is a difference between determining the meaning of an agreement based upon the parties' expressions and determining whether the parties have an agreement at all based upon their conduct. *See* Restatement

(Second) of Contracts § 200 cmt. a ("Questions of interpretation arise in determining whether there is a contract as well as in determining rights and duties under a contract.").

With that said, the court expresses no opinion as to whether plaintiff may have a valid defense based upon an implied-in-fact accord and satisfaction as well as one based upon an express accord and satisfaction.

15. Also pending before the court is the government's Motion to Postpone Trial Regarding Liability so that the Central Liability Issue Can Be Added to the Scope of Trial, filed May 31, 2012.

For the reasons stated in the court's prior opinion, *Sikorsky*, 102 Fed.Cl. 38, in the court's order of January 20, 2012, ECF No. 150, and at the hearing held on June 15, 2012, that motion is also DENIED.